DeGOOYER, et al, Respondents, v. HARKNESS, et al, Appellants

(13 N. W.2d 815.)

(File No. 8628. Opinion filed April 7, 1944.)

**Fred D. Shandorf** and **Fellows & Fellows**, all of Mitchell, for Appellants.

**Theo. H. J. Studt, of Highmore**, and **Royhl & Longstaff**, of Huron, for Respondents

RUDOLPH, J.   The plaintiffs are the special administrator and administratrix of the estate of their son, Gerald Karns DeGooyer.   This action was brought to recover for the alleged wrongful death of Gerald.   The defendants are the superintendent and athletic coach of the Highmore, South Dakota High School.   The case was tried to a jury which returned a verdict in favor of the plaintiffs and the

defendants have appealed. The facts are substantially as follows:

The boys who participated in athletics in the High School at Highmore organized a club which is known in the evidence as the "H" Club. Boys who had been awarded the school monogram "H" for participation in athletics were eligible to membership in this club. Toward the end of each school year the members of the club attending the high school conducted an initiation to receive into the club those who had been awarded the "H" during the school year. The athletic coach generally participated in these initiation ceremonies which, in prior years, had been held in the basement of the Catholic Church at Highmore. However, in May, 1941, the basement of the church was undergoing repairs and the defendant Maurice Gardner, who was the athletic coach of the Highmore High School, requested from the defendant Kenneth M. Harkness, who was superintendent of the Highmore Schools, that the club be permitted to conduct the initiation in the high school gymnasium. This request the superintendent granted. On the evening of May 1st, 1941, the members of the club met at a local cafe and had their dinner. They then adjourned to the high school gymnasium for the purpose of conducting the initiation. At initiations in prior years the candidates for membership had been given an electric shock which was produced by means of running electric wires connected with batteries through a transformer which reduced the current. In 1941 this transformer was not available and the boys prepared an appliance whereby a jar of water containing salt was used for a rheostat. The electric current was obtained from the electric light socket which carried a current measuring from 117 to 120 volts. Each boy was brought separately into the gymnasium, clothed only in shorts, and while blindfolded was caused to lie down upon the floor where several parallel wires had been connected. These wires were connected with the electric current which ran from the light socket through the jar of distilled water containing the salt solution. While the boy was lying on these wires he was either handed a glass of water or a glass of water was placed upon his chest. The current was then turned on,

the result being that the boy receiving the shock would respond and the glass of water would either spill over him or on the floor. At this particular initiation five candidates were being received. Following the administration of the electric shock and the spilling of the water, the floor was mopped and the defendant Gardner, who was present, tested the wires to determine the strength of the electricity. This test was made by placing the hands upon the wires. The fourth candidate to receive the electric shock complained that it was very strong and thereupon one of the boys emptied approximately one-half of the solution from the jar and filled the jar with city water. Thereafter the wires were tested by Mr. Gardner and some of the boys present. Gerald was then brought blindfolded into the room, placed upon the wire mat, and the current was turned on; Gerald partially rose from the mat, said "Oh, My God" and fell backward, whereupon the current was immediately turned off. It was thought at first that Gerald had fainted, but it was soon discovered that his condition was serious and immediately a call was sent for doctors who soon arrived upon the scene. Attempts were made to revive Gerald, but these were unsuccessful. It appears quite definitely that Gerald died immediately upon receiving this electric shock. Gerald was twenty years old, six feet tall and weighed 175 pounds. He had been examined physically at the opening of the school year and found physically sound. This examination was conducted by a practicing physician in Highmore.

We consider first the liability of the defendant Gardner. The facts disclose that Mr. Gardner actively participated in the initiation activities, that it was he who tested the electrical appliance, and that he played an active role in this whole proceeding of administering the electric shock. We are of the opinion, therefore, that so far as his liability is concerned it is immaterial whether he was acting in a personal capacity or in his capacity as athletic coach or teacher.

Electricity is generally recognized as a dangerous agency, and because of this fact this court has held that an electric company in the distribution of electricity is charged with the highest degree of care that skill and vigilance can

suggest, consistent with the practical conduct of the business. Roster v. Inter-State Power Co., 58 S. D. 521, 237 N. W. 738. We are of the opinion that an individual should be held to a similar high degree of care when he joins with others in the act of transmitting into the body of another a current of electricity. Such, apparently, was the holding of the Alabama court in the case of Supreme Lodge of the World, Loyal Order of Moose et al v. Gustin, 202 Ala. 246, 80 So. 84. In that case the facts are similar to the facts before us, in so far as they deal with a death from electric shock given while a candidate was being initiated. The court in that case held that the question of negligence, either as to the use of the apparatus or the manner of its operation, were questions for the jury.

■ The defendant Gardner must be charged with knowledge that electricity is dangerous. His duty in participating in the act of transmitting the electric current to the body of Gerald was to use the highest degree of care that skill and vigilance could suggest. The facts disclose that the rheostat used was at best a very crude and hastily prepared contrivance; the shock was administered while the boy reclined on a wet or damp floor (it is generally known that an electric shock is enhanced when a part of the person who receives the shock contacts a wet surface); the tests that were made included only two of eight or more wires; the evidence disclosed that the boy preceding Gerald had received a severe shock. These facts, in our opinion, are sufficient to support the finding of the jury that Mr. Gardner failed to observe the high degree of duty owing to Gerald.

■■ It is next contended that the evidence fails to disclose that the administration of the electric shock was the proximate cause of Gerald's death. Proximate cause of the injury is the immediate cause; it is the natural and continuing sequence, unbroken by any intervening cause, preceding the injury and without which it could not have happened. Proximate cause means probable cause. Joslin v. Linder, 26 S. D. 420, 128 N. W. 500. So in this case, keeping in mind the generally recognized dangerous character of electricity, the probable and only cause of Gerald's death shown by the

record was the administration of an excessive current of electricity to his body. The record discloses no intervening cause.

■ Appellants also contend that Gerald was negligent. The record does show that Gerald knew or at least had a well-grounded suspicion that he was to be subjected to an electric shock of some kind. The record is clear that Gerald did nothing which could be considered negligent other than submit himself to the initiation knowing or having a suspicion that he was to be subjected to an electric shock of some kind. The issue raised by appellants on this feature of the case is in effect that Gerald, knowing that he was to be subjected to an electric shock, assumed the risk thereof. Certainly Gerald had the right to assume that every proper precaution for his safety would be taken; he did not assume the risk of injury by defendants' acts of negligence. Polluck v. Minneapolis & St. Louis Railroad Company, 44 S. D. 249, 183 N. W. 859; Finger v. Northwest Properties, Inc., 63 S. D. 176, 257 N. W. 121.

■ Respondents have filed no brief in this court and we have been unable to discover any basis or theory which would support the claimed liability of the defendant Harkness. The record is clear that the only connection of Mr. Harkness with this sad occurrence was granting permission to Mr. Gardner to use the school gymnasium for the "H" Club initiation. Even assuming that this "H" Club initiation was a part of the school activities and subject to the control and supervision of the school authorities (which assumption is, in many respects, contrary to the evidence), nevertheless, we do not believe that there was any duty resting upon Mr. Harkness to be personally present at these proceedings. The athletic program of the high school was under the immediate supervision of Mr. Gardner. Mr. Gardner had requested the use of the gymnasium, it was understood that he was to be present and he was present during the proceedings. There is no specific provision of the contract of employment between Mr. Harkness and the school district which required his presence at this meeting. In the absence of any such contractual provision, reason will not justify a holding that

a superintendent of schools must be personally present at every school function, or assume liability for the neglect of the teacher or instructor personally present. Under the facts disclosed by this record, we believe Mr. Harkness performed his full duty, if any, when he determined that Mr. Gardner was to be present at this initiation, and permitted the use of the gymnasium with knowledge of this fact.

■ At the trial of the case Mr. Gardner attempted by his testimony to make it appear that he had no jurisdiction or supervision over the boys during this initiation proceeding. This testimony was contradictory of that given at the coroner's inquest, at which time he specifically stated that it was he who had given the boys permission to use this particular electrical device, and that he had "full charge of the 'H' Club." These statements made at the coroner's inquest were properly received by the court as impeaching Mr. Gardner's statements at the trial. It appears quite definitely from the record, we believe, that this evidence was admitted by the trial court for the purpose of impeaching or contradicting the testimony given by Mr. Gardner, and not as original or substantive evidence.

■ Under the express provsions of SDC 27.0220 a certified copy of the death certificate required by our law " * * * shall be prima facie evidence in all of the courts of this state of the facts therein stated. * * * " The plaintiffs offered in evidence a certified copy of the death certificate of Gerald which was objected to by defendants as "not binding on defendants or either of them, and not the best evidence, no proper foundation laid and is incompetent, and that said certificate or purported certificate is not binding upon the defendants or either of them as to the cause of death." The appellants now complain that this death certificate contained a statement of the verdict of the coroner's jury, and contend that for this reason it should not have been received in evidence. We are convinced that even under the holding of this court in the case of Chambers v. Modern Woodmen, 18 S. D. 173, 99 N. W. 1107, to the effect that the coroner's verdict is not admissible in evidence in an action to recover for death, that a statement of the verdict

in the death certificate should not be grounds for excluding the whole of the certificate. It might be that appellants, had they requested it, would have been entitled to an instruction by the court advising the jury that the verdict of the coroner's jury, as set out in the certificate, was not to be considered and of no probative value in the action, or it might be that upon proper objection the part of the certificate setting forth the coroner's verdict should be excluded, but in view of our express statutory provision, we do not believe it was error for the trial court to refuse to exclude the whole of certificate as requested by appellants.

The judgment appealed from is reversed as to appellant Harkness and sustained as to the appellant Gardner.

All the Judges concur.