RIKANSRUD et al., Respondents v.
CITY OF CANTON, Appellant

(116 N.W.2d 234)

(File No. 9950. Opinion filed July 13, 1962)

**Woods, Fuller, Schultz & Smith, J. B. Schultz,** Sioux Falls, for Defendant and Appellant.

**Samuel W. Masten,** Canton, for Plaintiffs and Respondents.

SMITH, J. Water from a broken city main flooded and damaged the foundation, basement and sidewalks of

plaintiffs' home. It is the theory of plaintiffs that this water gained entrance to their premises by following along through the backfilled trench of a city trunk sewer, and thence through the backfilled trench of plaintiffs' service sewer. They make no claim that the break in the water main resulted from negligence of the city. They allege the city did negligently construct, maintain and repair the described trunk sewer and thereby caused the water to enter the premises. The answer of the city includes a general denial and allegation that plaintiffs' damage was the result of their contributory negligence in the construction and maintenance of their service sewer. By motions made at the trial the city sought a directed verdict, and after verdict it moved for judgment n. o. v. The principal contention here is that the trial court erred in overruling these motions of the city.

We elect to develop the controlling facts by (1) describing the arrangement of the trunk sewers and water mains involved, (2) revealing some facts connected with events of August 1959 intervening the construction of the trunk sewer adjacent to plaintiffs' home and the time of the flooding, and (3) detailing the events surrounding and following the flooding. We serve our convenience by referring to trenches which have in fact been backfilled as trenches.

In the city of Canton, Kimball Street, which extends north and south, intersects Walnut Street which runs east and west. Plaintiffs' recently constructed home is located on the southeast corner of that intersection. Its service sewer angles somewhat south of west from the southwest corner of the basement and connects with a trunk sewer which extends north and south along the center line of Kimball Street. At the first intersection to the south, Kimball Street crosses Elder Street which runs east and west. Another trunk sewer extends along the center line of Elder. The Kimball trunk and the Elder trunk enter a common manhole located at the center of the intersection of those streets. These trunk sewers are

sunk to a depth of 10 feet at that point. The Kimball trunk north of Elder was constructed at two different times. It was first run about half way up the block to serve a house on the west side of the street in about 1956. In about 1958 it was continued on north and around the corner to the west on Walnut to serve another home then under construction. In the fall of 1958 plaintiffs commenced construction of their home and made their connection to the portion of the trunk last constructed.

Running parallel with the Elder sewer, and slightly to the north thereof, at a depth of 6 feet, a 6-inch water main extends along Elder. At a point somewhat east of the center of the Kimball-Elder intersection a 2-inch water main takes off from the Elder 6-inch main and runs south along Kimball. It was at the point where this 2-inch water main crosses above the Elder trunk sewer that the break occurred from which the flooding resulted. For some unexplained reason this 2-inch main broke apart as though it had been sawed.

Kimball does not carry a water main. Plaintiffs' water service connects with a main extending along Walnut and enters the northwest corner of the basement. Kimball does carry a natural gas main. This main is located near the west curb line. Neither its depth nor the time it was constructed is revealed by the record. A service line extends from this gas main across Kimball and enters the southwest corner of plaintiffs' basement. The depth of this line is not disclosed by the record. The location of the gas main in relation to the water and sewer trunks at the Kimball-Elder intersection is not evidenced.

Plaintiffs moved into their home in June 1959. Precipitation had been heavy during the season. On a Sunday morning in August following a heavy rain, as the plaintiff wife backed their automobile into Kimball Street from the garage at the southwest of their home, both wheels on one side broke through up to their axles into the trunk sewer trench. Thereafter two city employees arrived with

a large truck and tractor. They pulled plaintiffs' motor vehicle out and proceeded to break the trench down somewhat south and north of plaintiffs' driveway. Thereupon, they filled the open trench with gravel which they then compacted by running the wheels of the heavy truck, loaded with gravel, along in the trench. Whenever it lodged they extricated it with the tractor. During this operation the plaintiff husband discovered a place in or near the center of the intersection of Walnut and Kimball where rain water draining down from the north and east was disappearing underground.

On Monday the city employees returned with the same equipment and a grader. They broke the trench all the way north to the intersection of Walnut and Kimball. Then they raised the grader blade to a perpendicular position and employed its point to break through the line of the trunk trench to a depth of about 20 inches searching for hollow areas. In this manner they explored through the heavier oil mat all the way to Elder. They found a hollow area about where plaintiffs' service sewer connects with the trunk, and another such area further south. They filled the trench thus opened with gravel and compacted as above described.

The record reveals that this same method of filling and compacting was employed by the city in the original construction of the two portions of the trunk sewer located between Elder and Walnut on Kimball.

After this August occurrence plaintiff husband suggested to the street commissioner that the trunk trench should be broken in all the way to Elder. The commissioner said he would take care of it. Except as hereinbefore desscribed the trench was not broken down.

On a morning in March 1960 when the supervisor of the waterworks reported for work he noticed that although all three pumps were operating, they were making no gain on the supply registered on the gauge. Ordinarily, at that hour at least one pump could be shut down. He im-

mediately initiated a search for some unusual use, an open hydrant, or for water on the surface indicating a break in a main. His search failed to reveal a cause for the water loss. In midafternoon plaintiffs discovered water entering the southwest corner of their basement. Within a short period pressure shook the whole house, slabs of concrete in the basement floor buckled and raised, and water spurted up about 12 inches along a 15-foot break therein. After the city was notified, it took some 2½ hours for it to discover the mains involved and the controlling valves. It was the next day after working throughout the night before the break was uncovered. This work was rendered difficult because of the frozen ground. During that period four holes were sunk in and around the intersection at Kimball and Elder. The first hole was along the curb line in Kimball just outside the northeast corner of the intersection. They found mud in that hole, and when the valves were opened more water appeared. The next hole was in the northeast portion of the intersection itself. Here they found soup. They did not make a test here by opening valves. The next hole was in the southeast of the intersection. It was dry. The fourth hole uncovered the break in the 2-inch main. The plaintiff husband looked down into that hole. He testified an area had been hollowed below the broken water main down to and revealing the trunk sewer.

From the damage resulting to the foundation, sidewalks and basement floor, the inference is warranted that a considerable volume of water was forced in and all around plaintiffs' home. A large hole appeared under the garage and a sidewalk which extended along the south side thereof. This void extended out into the lawn along the service sewer for a short distance. Another hole appeared where the service sewer intersected the curb line of Kimball. The city filled both these holes with gravel.

A witness testified that plaintiffs' basement and foundation must be constructed anew to place the property in its original condition.

■ As we have indicated the plaintiffs predicate their right to recover on the negligence of the city. For damages resulting from flooding of private property the proximate cause of which is its negligence in the construction or operation of its sewer or water utilities, a municipal corporation is liable; it is not an insurer and liable for such damages in the absence of legal fault on its part. Dell Rapids Mercantile Co. v. City of Dell Rapids, 11 S.D. 116, 75 N.W. 898, 74 Am.St. Rep. 783; Midwest Oil Co. v. City of Aberdeen, 69 S.D. 343, 10 N.W.2d 701; Shann v. City of Rapid City, 72 S.D. 418, 35 N.W.2d 399; and 18 McQuillin, Municipal Corporations, 3d Ed. § 53.-125, p. 495.

■ The city concedes that water from its broken main caused the damage here in question. Putting the alleged contributory negligence of the plaintiffs to one side for the moment, the question is whether an inference is warranted that negligence of the city in backfilling and compacting the trenches of their described trunk sewer lines, and in maintaining the density of the soil in those trenches was a legal cause of the damage to plaintiffs' property. By its motions and arguments the city takes the position not only that such an inference is not warranted, but an inference that the water was conveyed through those trenches is not supported by the evidence. It does not suggest it was privileged to conduct itself as it did even though it knew or should have known that its acts involved a risk of harm to plaintiffs. The city recognizes we are bound to review the ruling of the trial court on its motions in the light of the settled principle that a court must not take a case from the jury if the evidence offers room for impartial minds, acting reasonably, to draw different inferences. Schmeling v. Jorgensen, 77 S.D. 8, 84 N.W.2d 558.

Whether the evidence supports a finding of a jury that the water flowed along the trenches of the trunk sewer is the question we will first consider. Such a find-

ing must rest on circumstantial evidence. In Erickson v. Todd, 62 S.D. 280, 252 N.W. 879, this court said:

"* * * in order that a theory be established by circumstantial evidence, the facts and circumstances shown must not only be consistent with such theory, but inconsistent with any other rational theory. * * *"

To this holding, and to our several subsequent decisions in which we have adhered thereto, counsel points in arguing the evidence does not sufficiently exclude the probability that the water reached plaintiffs' home along a different course. An expert called by the city refused to express an opinion as to the course followed by the water. As possible courses, he suggested the sewer trenches, the natural gas trench, the frost line, or a silt or sand strata.

■ We are dealing with water under pressure, confined by the surrounding soil. Common knowledge that such water will seek the path of least resistance was affirmed by the expert of the city. With that fact in mind we turn to a consideration of the paths it has been suggested the water may have followed.

■ As plaintiffs' action is predicated and was tried on the theory that the water made its way to their property through the sewer trenches, we first view the evidenced circumstances which support that theory.

That the water originated in the Elder trunk sewer trench and eventually was present in plaintiffs' service sewer seems not open to serious debate. Looking into the excavation by which the break was discovered plaintiff could see past the broken 2-inch water main down to the 10-foot level where the force of the water had hollowed out an area and exposed the trunk sewer. Over at the home, a large hole was washed out on the south side of the garage in the area traversed by the service sewer, and again, where the service sewer trench intersected the curb line another hole developed. What of the trenches between these extremities?

The answer to this inquiry involves the construction of the intervening trenches and the defects which developed therein prior to the time the break occurred in the water main. It will be recalled that the approximate south half of the Kimball trunk had been laid some four years, and the north half about two years, before the break. The method of backfilling was uniform throughout and, as to the south half, was described by the superintendent in these words, "Well, it was filled in slowly and when we got in enough we could (sic) there was a loaded truck generally filled with dirt, and run it back and forth up and down the ditch. If it gets stuck in there, we pulled it out with the tractor and add in more dirt and then pack it back down again." Significantly, he said nothing about adding water to aid compaction. After these trenches had been so backfilled and compacted, an oil mat was applied to the street. The mat at the north end was much more shallow than that at the south end. That the process of natural compaction and settling which followed created voids under the oil mat on Kimball is an established fact. This process was undoubtedly furthered by rain water draining into the trench. It is not disputed that water draining from the higher ground to the north and east was seen entering the trench through a hole at Kimball and Willow in August 1959. The words of the superintendent of the city in describing the breakthrough of the wheels of plaintiffs' automobile are of significance. He said, "* * * now right in front of the garage there there was a little crust, you know how clay will get when you roll it, and it gets a crust? Well, then it had settled from the water in the ditch. I suppose, from the frost there and the rain, and it was settled away from it * * *". Mention of this breakthrough of plaintiffs' automobile in August 1959 directs attention to the work done along the sewer trench on Kimball at that time. The crust over the trench was broken in all the way from the point where plaintiffs' service sewer connects with the trunk to and around the corner of Walnut. The trench was then backfilled with gravel and the truck was employed in compacting as heretofore described.

To the south from plaintiffs' service connection a different method was used. It will be recalled that a heavier oil mat had been laid over this area. The point of a grader blade was used to cut through to a depth of 20 inches seeking voids. But two were found and they were filled with gravel.

The same character of clay soil being involved, and the same methods having been employed in compacting that soil throughout all Kimball, it seems to us, based on the condition of the trench revealed by the breaking in the north half thereof, a finder of the fact could reasonably conclude that (1) the method employed failed to a considerable degree to compact the backfill to either the density of the surrounding soil or to a proper density, (2) the south half of the trench contained either loosely compacted soil, or, wherever rain water had drained in, voids similar to those found in the north half which were not revealed by the 20-inch thrust of the grader blade point through the heavier oiled mat and rolled clay crust in that area, (3) whether the south half contained voids or loosely compacted soil or both, it offered very much less resistance to water under pressure than the surrounding soil, and probably very little resistance to such pressure, and (4) the sewer trenches offered a ready-made continuous line of low resistance to the described confined water. We are persuaded therefore that the evidenced facts not only are consistent with plaintiffs' theory but supply strong rational support for that theory.

Are the evidenced circumstances as a whole inconsistent with any other rational theory? It will be observed that no physical facts are evidenced warranting an inference that water was actually present in and followed any of the other courses suggested as possible courses. They remain mere possible courses rather than rationally probable courses. Cf. Klein v. W. Hodgman & Sons, Inc., 77 S.D. 64, 85 N.W.2d 289. In our opinion the facts to which we have pointed as offering solid support for an inference that the water actually was present in and followed the sewer

trenches offer like rational support for an inference that it followed neither of the other courses suggested as possibilities.

Next to be considered is the contention the proof fails to support the allegations of negligence on the part of the city. A narrow question is presented by the argument. We are told the city was not negligent because the flooding of plaintiffs' property was not a foreseeable consequence of the conduct of the city in backfilling and maintaining its described trunk sewer trenches.

■ ■  The contention that the consequences were not foreseeable is framed in terms of proximate cause. We deem foreseeability to be a determinant of the duty element of negligence. Cf. 65 C.J.S. Negligence § 109, p. 665; Prosser, Law of Torts, 2d Ed., p. 258; and Green, Foreseeability in Negligence Law, 61 Col.L.Rev. 1401 at 1417. Therefore, our concern is with the duty of the city to protect plaintiffs from harm. Its duty, of course, was to exercise ordinary care. SDC 47.0304. In Granflaten v. Rohde, 66 S.D. 335, 283 N.W. 153, it was written:

> "Ordinary care in the abstract is such care under the same or similar circumstances as an ordinarily prudent or reasonable person would exercise. It is commensurate with existing and surrounding hazards. The greater the danger, the greater is the care required, so that a very high degree of danger calls for a very high degree of care, which, however, amounts to ordinary care in view of the situation and circumstances."

The principle is formulated in Restatement, Torts, § 298, as follows:

> "When an act is negligent if done without reasonable care, the care which the actor is required to exercise to avoid being negligent in the doing of the act is that which he, as a reasonable man, should recognize as necessary to prevent the

act from creating an unreasonable risk of harm to another."

And at § 289 of that work it is written:

"The actor should recognize that his conduct involves a risk of causing an invasion of another's interest, if a person,

"(a) possessing such perception of the surrounding circumstances as a reasonable man would have, or such superior perception as the actor himself has, and

"(b) possessing such knowledge of other pertinent matters as a reasonable man would have or such superior knowledge as the actor himself has, and

"(c) correlating such perception and knowledge with reasonable intelligence and judgment would infer that the act creates an appreciable chance of causing such invasion."

and at § 435 of that work, the further significant principle appears, viz.,

"If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable."

This principle was declared in Houska v. Hrabe, 35 S.D. 269, 151 N.W. 1021, L.R.A. 1915D, 1074.

With these applicable principles in mind, we turn back to the facts, considered in the light most favorable to plaintiffs.

It follows from our discussion of the contention dealing with circumstantial evidence we are persuaded the evidence warrants an inference that the flooding was a consequence of the failure of the city to compact the soil

in its described trenches to a reasonable density and to act with ordinary care after it learned of the actual condition of those trenches. We approach the question of foreseeability under that assumption. The question to be answered is whether we can say as a matter of law that the circumstances did not require a reasonable person, possessing whatever superior perception the city had acquired through its experience in constructing and operating water and sewer utilities, to recognize that an unreasonable risk of harm to another would be created if it failed to sufficiently compact or repair its sewer trenches.

■■ Knowledge is common, at least to city dwellers, that breaks in water mains are to be expected. From the facts revealed by this record, it is demonstrated that water so released under pressure, and confined by the surrounding soil, offers a potential threat of not inconsiderable harm. Even after pushing through the trenches for a little more than half a block, this water spread over the area of the underside of a portion of the basement floor and generated a lifting force sufficient to buckle the concrete and shake the entire house. And in Midwest Oil Co. v. City of Aberdeen, 69 S.D. 343, 10 N.W.2d 701, water under pressure so released and confined under ground spread over the surface of an underground tank, broke its way in and forced fuel and water out of its above-ground vents. Frozen ground played a part in confining the water underground in both instances. Perhaps the harm actually inflicted in neither instance could have been foreseen. However, we think a jury could reasonably conclude it to be highly improbable that a city could build and operate water and sewer systems throughout long years and, from such experience, fail to recognize (a) the serious threat of harm in the release of water under pressure from a broken main, (b) the tendency of frozen ground and paved surfaces to confine such water underground, and (c) that loosely compacted sewer trenches might well offer such water a pathway of least resistance. Further, we think a jury could also conclude experience would teach a city that a considerable volume of water might well

accumulate under ground before the break could be discovered and controlling valves closed.

One who, because of such superior perception, recognized the over-all nature of the risk involved, would unquestionably be negligent if he knowingly created a flue which could serve as a pipe to carry such a destructive force to the premises of another. And, because of the serious harm such released water threatens, we are of the opinion he should not be heard to offer, as the sole justification of his conduct, that the chance of a broken water main in the particular area was slight. By the same token, we are persuaded that one possessed of such superior perception must be held to have foreseen that his conduct entailed an unreasonble risk of harm to another, if through lack of ordinary care he provided a pathway to the property of another which would offer little resistance to water from a broken main. Because, if the city was negligent in the described respect with reference to the trunk sewer trench on Kimball, such negligence had in it the potency of harm to plaintiffs' home from a water main break on either Elder or Walnut, it would be a wrong in relation to plaintiffs. Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253. From all of which it will appear we are of the opinion that foreseeability was an issue of fact for the jury.

Contributory negligence of plaintiffs urged as a ground for a directed verdict is presented in two aspects, neither one of which appeals to us as persuasive. The common background of fact put forward in support of both theories must be epitomized.

Two other service sewers lead into the Kimball trunk sewer between Elder and Walnut. One of those services connects with the trunk at a point south of plaintiffs' connection, and the other to the north thereof. Water from the broken main did not enter the basement of either of these other properties. Predicated on this fact, and on the assumption that the water was conveyed from Elder by the trunk trench, the city asserts it to be demonstrated that

the water reached plaintiffs' home because of their negligence in backfilling and compacting their service sewer trench. The city presents these assumed facts from two different aspects.

■ First, we are told that this claimed negligence in backfilling their own trench constitutes such an intervening cause of plaintiffs' damage as breaks the chain of causal connection between the negligence of the city and the damage to plaintiffs' property.

In Schmeling v. Jorgensen, 77 S.D. 8 at 18, 84 N.W.2d 558 at 564, we declared:

"Proximate cause of an injury is the immediate cause; and must be understood to be that which, in a natural and continuous sequence, unbroken by any new, independent cause, produces the injury, and without which it could not have happened. * * * When the natural and continuous sequence of causal connection between the negligent conduct and the injury is interrupted by a new and independent cause, which itself produces the injury, that intervening cause operates to relieve the original wrongdoer of liability. The intervening cause must be a superseding cause. It must so entirely supersede the operation of the defendant's negligence that it alone, without his negligence contributing thereto, produces the injury."

Under the assumption, supra, the negligently compacted trenches of the city and plaintiffs united to form the bed of the underground stream of water which harmed plaintiffs. This water was under pressure supplied by the city. The operation of plaintiffs' negligence did not so entirely supersede the operation of defendant's negligence that it alone, without the city's negligence contributing thereto, produced the injury. Plaintiffs' assumed negligence and that of defendant operated concurrently to produce the harm in question. Hence the position of the city is untenable.

Second, it is asserted that the evidence establishes as a matter of law that plaintiffs, or those for whom plaintiff was responsible, were so contributorily negligent as a matter of law as to require a direction for the city.

Except that the duty of plaintiff is to conform his conduct to the standard of a reasonable man in the protection of his own interests rather than the interests of others there is no important difference between negligence and contributory negligence. Restatement, Torts, § 463. Included in the principles which are applicable in both areas are those stated in § 289, Restatement, Torts, quoted with approval supra. That is to say, the reasonably prudent man to whom plaintiff must conform his conduct is one possessed of such superior perception of the surrounding circumstances and knowledge as plaintiff actually possesses.

██ ██ Attempt was made to prove that at least the plaintiff husband, one of the owners in joint tenancy of the damaged property, was experienced in the water and utility field by establishing that he then was, and for seven years had been, a member of the city commission. However, he testified that he had served throughout as finance commissioner and had had little connection with the water and sewer departments. It is clear that the record is not sufficient to impel an inference that either the husband or the wife had any superior perception or knowledge which would warn them of the threat to their interests of water from a broken city main on Elder or Walnut. Neither do we think it can be said, as a matter of law, that an ordinary reasonable and prudent man, not possessed of such superior perception and knowledge would foresee that plaintiffs' sewer must be compacted to meet the impact of water under pressure from a broken main on Elder or Walnut. Indubitably, if plaintiffs conformed to the standard of an ordinary prudent person in compacting their sewer, they would not need to do more in anticipation of the negligence of the city in constructing and maintaining its trunk and its trenches. In the absence of knowledge to the contrary, one who is conducting himself in accordance

with standards of ordinary care may assume that he is not to be exposed to harm from a breach of duty which others owe to avoid injury to him. 65 C.J.S. Negligence § 118 c., p. 715. For these reasons we have concluded that if the record will support a finding of contributory negligence, the issue was of fact for the jury.

All of the assignments have been considered with care. Our conclusion is that the court did not err in overruling the motions of the city for a directed verdict, and that otherwise the record reveals no prejudicial error.

The judgment of the trial court is affirmed.

RENTTO, P. J., and BIEGELMEIER, J., concur.

ROBERTS and HANSON, JJ., dissent.