WARD, Respondent
v.
LaCREEK ELECTRIC ASSOCIATION, INC., Appellant

(163 N.W.2d 344)

(File No. 10466. Opinion filed December 19, 1968)

**Martens, Goldsmith, May & Porter,** Pierre, for defendant and appellant.

**Bangs, McCullen, Butler & Foye,** Rapid City, for plaintiff and respondent.

HANSON, Presiding Judge.

This is an action for water damage to the interior of a ranch house allegedly caused by defendant LaCreek Rural Electric Association's unauthorized or negligent acts. The jury awarded $10,080 damages and defendant appeals alleging numerous errors. Only those relating to (1) the sufficiency of the evidence to establish negligence, (2) standard of care for electrical companies, and (3) the measure of damages for injury to real property need be discussed.

Plaintiff, Hazel Ward, owns a 2,000 acre ranch located 17 miles south of Martin, South Dakota. She lived on the ranch for 34 years in a one story dwelling constructed in 1933. The basement was finished and contained, among other appliances, an electrically operated pump which pumped water from a nearby well to pipes throughout the house. Plaintiff owned all wiring in the house including a control panel in the basement and the wiring from the house to a pole in the ranch yard.

The ranch house and outbuildings had been served by the defendant rural electric cooperative since 1955. It brought electricity to the yard pole on which was a meter and a breaker box with a manual switch. This electrical equipment was owned by defendant. When the switch on the breaker box was in a "down" or "off" position no electricity could enter the lines owned by plaintiff leading to the house and other outbuildings.

Having obtained a teaching position plaintiff moved to Martin in September 1965. Preparatory to leaving the ranch she closed the house for the winter. As part of this process she notified defendant she was moving to Martin and no longer desired electrical service. She then turned the electricity off at the yard pole by pulling the breaker switch down or on "off" position. She also drained the water from the pipes in the house by opening the faucets on the main floor and in the basement. They were left open. After plaintiff moved to town defendant disconnected its line at the road and removed the meter from the yard pole.

Later on plaintiff became concerned about not having electricity available at the ranch to activate the water pump in the event of fire. She phoned defendant's office seeking advice in this regard and talked two or three times with Ruth Andrews, an office employee. Mrs. Ward expressed her desire to have electricity available in case of fire. If it was all right with defendant, she thought it would be better to shut the electricity off at the yard pole so mice couldn't get at the wires and start a fire. It was suggested by defendant's employee that Mrs. Ward could shut off the breakers at the yard pole and could wire or padlock the breaker box on the yard pole. Following these conversations Mrs. Ward sent a check to have electric service resumed. On November 10th defendant's employees reconnected and reinstalled the line from the road to the ranch yard pole. The breaker switch on the yard pole was left "off" so no electricity could enter the line running from the pole to the house.

As part of an improvement or modernization program defendant's employees came to plaintiff's ranch on December 31st and intalled a new transformer without notice to Mrs. Ward. The new transformer contained automatic circuit breakers. Therefore, the old breakers were removed from the breaker box on the yard pole. When removed the breaker switch was in "off" position. Although defendant's truck was equipped with two-way radio the employees did not contact their office for information or instructions before proceeding to install the new trans-

former and reconnecting the meter. The jury could reasonably infer this energized the line running from the yard pole to the house which in turn activated the water pump in the basement causing water to flow from the open faucets. Also the jury could reasonably infer this condition persisted from December 31, 1965 to February 6, 1966 when discovered by plaintiff's daughter. The water saturated and dampened the whole house causing warping, rusting and mildewing.

 Considered in the light most favorable to plaintiff there is sufficient evidence to establish jury issues as to defendant's negligence and its proximate cause of the damages. Its liability was not contingent upon foreseeability of the "extent of the harm or the manner in which it occurred." Restatement, Torts §435; Rikansrud v. City of Canton, 79 S.D. 592, 116 N.W.2d 234; Loonan Lumber Company v. Wannamaker, 81 S.D. 51, 131 N.W.2d 78. The duty to foresee a risk of harm is dependent upon all the surrounding facts and circumstances and may require further investigation or inquiry before action is taken. As pointed out in Comment j, Restatement 2d, Torts § 289:

> "It is not necessary that the actor should realize that the circumstances surrounding him are such as to make his conduct likely to cause harm to another. It is enough that he should realize that his perception of the surrounding circumstances is so imperfect that the safety or danger of his act depends upon circumstances which at the moment he neither does nor can perceive. In such case it is negligent for him to act if a reasonable man would recognize the necessity of making further investigation. If he acts without such investigation, he must, as a reasonable man, realize that his act involves a risk depending upon the character of the unknown surroundings. There may be situations in which the importance of immediate action prevents the risk from being unreasonable, as where an act is done in an emergency which affords no time for investigation and is reasonably necessary for the protection of some valuable interest of the actor or of a third person."

In the present action, defendant was charged with knowledge that plaintiff had closed her ranch house for the winter; had been granted permission to terminate electric service at the yard pole; and had permission to use the breaker switch on the yard pole for this purpose. It was turned "off" when she closed her house. It was left "off" when service was resumed in November. It was "off" when defendant's employees came to the ranch on December 31st to install a new transformer. Their truck was equipped with a two-way radio. They were not faced with an emergency. Nevertheless, they proceeded to install the new transformer and remove the breaker switch without seeking information or instructions from the home office. Their precipitate action without further investigation involved a risk of unknown harm which was assumed and for which defendant could be found responsible.

It is also contended the trial court erred in instructing the jury that the distribution of electrical energy is a highly dangerous activity and "one engaged in such an activity is under a duty to exercise a high degree of care commensurate with the activity to prevent injury to persons or property from its use." In Roster v. Inter-State Power Co., 58 S.D. 521, 237 N.W. 738, this court held that in the distribution of electricity an electrical company is charged with "the highest degree of care that skill and vigilance can suggest, consistent with the practical conduct of the business." See also De Gooyer v. Harkness, 70 S.D. 26, 13 N.W.2d 815, applying the same standard of care to an individual.

Defendant suggests the court should have instructed it "was the duty of defendant to use ordinary care under all the circumstances consistent with the practical operation of its business." This is actually a distinction without a difference "for the ordinary care required under the circumstances is, in its practical application and in view of the highly dangerous character of electricity, a relatively high degree of care." 26 Am.Jur.2d, Electricity, Gas, and Steam, § 42, p. 248. The same conclusion is expressed in Hale v. Montana-Dakota Utilities Co., 8 Cir., 192 F.2d 274 as follows:

> "Electricity is regarded as a dangerous agency and the degree of care required to be used in its production and distribution is the highest degree of care that skill and vigilance can suggest consistent with the practical conduct of the business. De Gooyer v. Harkness, 70 S.D. 26, 13 N.W.2d 815; Roster v. Inter-State Power Co., 58 S.D. 521, 237 N.W. 738. The degree of care resting upon such companies is variously expressed. Such companies are bound to use reasonable care in the construction and maintenance of their lines which means such care as a reasonable man would use under the circumstances. The degree of care which will satisfy this requirement varies with the danger which will be incurred by negligence and must be commensurate with the danger involved and that may otherwise be expressed as the utmost care and prudence consistent with the practical operation of its plant. Interstate Power Co. v. Thomas, 8 Cir., 51 F.2d 964, 84 A.L.R. 681; Greenwald v. Northern States Power Co., 226 Minn. 216, 32 N.W.2d 320."

The trial court went on in the second paragraph of the same instruction to advise the jury that "the defendant, LaCreek Electric Association, Inc., was under duty to the plaintiff, Hazel Ward, to exercise a high degree of care to determine if the breaker switches could be removed without injury to plaintiff's property". This repetitious and factually related portion of the instruction added nothing and could well have been omitted. On retrial it should be omitted and instead of the instruction given we suggest the following: "The distribution of electrical energy is a highly dangerous activity and anyone doing so is under a duty to exercise ordinary and reasonable care under all the circumstances to prevent injury to persons and property. This requires care commensurate with the danger involved consistent with the practical operation of the business."

Plaintiff testified her ranch was worth $80 per acre before the house was damaged. Afterwards, it was worth $70 per acre or $20,000 less. A contractor, testifying for her estimated it would cost $13,412 to repair and substantially restore the house

to its former condition. In the opinion of a contractor, called by the defendant, the damage could be repaired and the house restored to pre-damage condition for $1,431.90 plus 20% for contractors' fees. The evidence further discloses plaintiff expended about $200 in repairs and a married couple was living in the house at time of trial.

The jury was instructed to fix the amount of money which would fairly compensate plaintiff for all damages resulting from the negligence of the defendant, "the measure of said damage being the difference between the value of the plaintiff's property before and after the damage to the house plus any damage to her personal property" and the jury in determining this amount could "take into consideration the cost of repairing said house to the extent that it can be repaired." Under the circumstances this instruction improperly allowed the jury to assess damages on the diminished value of the ranch as a unit. Such instruction would be proper in case of permanent injury to, or partial taking of, real property.

There is no one measure of damages so flexible it will fairly compensate for all injury to real property. Ordinarily, the rule to be applied in a given case depends upon whether or not the injury is permanent or temporary in character. 22 Am.Jur.2d, Damages, § 134, p. 194; 25 C.J.S. Damages § 84, p. 920. This explains, in part, the apparent lack of uniformity in some of our cases which is the subject of the following pertinent comment by the court in Big Rock Mountain Corp. v. Stearns-Roger Corp., 8 Cir., 388 F.2d 165:

> "The problem in this case was vexatious to the trial court not only because of the adamant and opposing positions taken by the parties on the measure of damages issue, but also compounded by lack of any opinion of the South Dakota Supreme Court that could be considered controlling. The latter is understandable inasmuch as there simply cannot be any single rule of law that will exactly fit the varying kinds of injuries that occur to property interests. We have carefully considered

all of the cases cited by the parties, as well as others, and cannot say that the position taken by the trial court conflicted with any South Dakota rule. There is nothing in any South Dakota opinion that persuades us that the South Dakota court would have ruled differently from the trial court here. None of the South Dakota cases cited by plaintiff deals with a part of a mechanical device that was easily restorable. For example, Chudy v. Larkin, 27 S.D. 86, 129 N.W. 755 (1911), involved the destruction by fire of a barn, fences, cyclone cellar, hog pens, orchards and shrubbery, shade and forest trees, etc. Pennington v. Beatty, 61 S.D. 73, 246 N.W. 109 (1932), involved the wrongful removal of pine trees from mining property under circumstances where the timber was necessary for use in mining operations and brought into play a statute contemplating that a trespasser removing trees should compensate the owner 'for the actual detriment.' 246 N.W. 109, 110.

"Such cases as these are obviously distinguishable, and the Supreme Court of South Dakota in Metropolitan Life Ins. Co. v. Farmers Co-op. Co., 68 S.D. 338, 2 N.W.2d 665 (1942), noted the inappropriateness of blindly applying the diminution rule in all actions for damages to real estate:

'The principal error assigned relates to the measure of damages. The court instructed the jury that the plaintiff should recover "the reasonable value of the fence that was taken by defendants as it stood upon plaintiff's farm." The appellants contend that in an action to recover damages for injury to real estate, the measure of the damages is the difference in value of the real estate before and after its injury. * * We do not believe an extended discussion of these cases is necessary. Conceding that they establish a general rule such as claimed by appellants, nevertheless, we do not believe any such rule should be applied to the facts

now before us. We are here concerned with the destruction of a wire fence which may be replaced at will and the value of which may be readily determined apart from the real estate. We think the sound measure of damages for the destruction of property of the nature of that here involved is its value as it stands on the real estate, which may be ascertained by determining the cost of constructing a similar fence or structure, and deducting therefrom the depreciation the old one had suffered by reason of age and use. (Citations omitted.)' 2 N.W.2d at 665-666.

"In Reed v. Consolidated Feldspar Corp., 71 S.D. 189, 23 N.W.2d 154, 157 (1946), there was involved a lessor's action to recover damages resulting from a cave-in due to lessee's negligent and unworkmanlike mining. The South Dakota court stated:

'We think that the measure of damages is the reasonable cost of restoration, unless such cost is greater than the diminution in value of the leased premises, in which case the difference in market value before and after the injury would be the proper measure of damages.'

"We cite these cases merely as examples and as an indication that the South Dakota rule seems to be in accord with the rules generally applied by the courts of this country."

Plaintiff contends a similar instruction was approved in the early case of Ulrick v. Dakota Loan & Trust Co., 2 S.D. 285, 49 N.W. 1054, involving damages to a brick business building resulting from the negligent removal of lateral support. However, on rehearing that case, see 3 S.D. 44, 51 N.W. 1023, the court indicated it was under the impression the case involved permanent injury to realty. It said the "rule approved in our former opinion, [was] that the general rule for measuring dam-

ages caused by a permanent injury to real estate is the diminished value of the property on account of the injury * * * This was not a transient injury to or destruction of restorable parts of a building only * * * but a permanent injury to the property itself. There could be no sinking of the foundation walls, without involving the soil upon and in which they were laid."

■ In the present case there is evidence the house could be repaired and it was being occupied and used at the time of trial. There is no evidence of loss of use. Furthermore, there is no evidence of structural damage or of any damage to the realty upon which it stands. As in Metropolitan Life Ins. Co. v. Farmers Co-Operative Co., 68 S.D. 338, 2 N.W.2d 665, we are here concerned with damages to a building which may be repaired and the value determined separate and apart from the real estate. See generally 22 Am.Jur.2d, Damages, § 137 et seq.; 25 C.J.S. Damages § 85 et seq.; Vol. 1 South Dakota Pattern Jury Instructions 30:10 et seq.; California Civil Jury Instructions 174 G. et seq.; Federal Jury Practice and Instructions 77.01 et seq. Accordingly, the proper measure of damages to be applied with reference to the house in this case is the lesser of the following:

I. The difference between the reasonable value of the house immediately before and immediately after its injury, or

II. The reasonable expense of repair if the house can thereby be substantially restored to its former condition.

■ ■ A new trial on the issue of damages only cannot generally be granted as the jury may mitigate damages attributable to plaintiff's contributory negligence, if any, under our comparative negligence rule. Hanisch v. Body, 77 S.D. 265, 90 N.W.2d 924.

Reversed.

All the Judges concur.