James H. ZACHER and Judy Ann Zacher, Plaintiffs and Appellants,

v.

The BUDD COMPANY, Yellowstone Molasses Service, Incorporated, and Dixon Brothers, Incorporated, Defendants and Appellees.

No. 14483.

Supreme Court of South Dakota.

Argued Nov. 28, 1984.

Decided Oct. 29, 1986.

Rehearing Denied Dec. 8, 1986.

Franklin J. Wallahan of Wallahan Law Offices, Rapid City, for plaintiffs and appellants.

Thomas E. Simmons of Bangs, Mc Cullen, Butler, Foye & Simmons, Rapid City, for defendant and appellee The Budd Co.

Edward C. Carpenter of Costello, Porter, Hill, Nelson, Heisterkamp & Bushnell, Rapid City, for defendant and appellee Yellowstone Molasses Service, Inc.

Gary D. Jensen of Lynn, Jackson, Shultz & Lebrun, Rapid City, for defendant and appellee Dixon Brothers, Inc.

SABERS, Justice (on reassignment).

This appeal arises from the final judgment entered upon the jury's verdict, the trial court's denial of plaintiff's motion for new trial, and orders awarding costs to defendants. We reverse and remand.

James Zacher (Zacher), an employee of the Windmill Truck Stop in Rapid City, South Dakota (Windmill), was injured on August 2, 1978, when a multi-piece truck wheel exploded during remounting. Zacher filed an action for damages based on the three substantive theories of product liability: strict liability, breach of implied warranty, and negligence. All three theories were asserted against each of three defendants: The Budd Company (Budd), manufacturer of the wheel; Yellowstone Molasses Service, Inc. (Yellowstone), owner and lessor of the wheel and the trailer to which it was attached at the time of the accident; and Dixon Brothers, Inc. (Dixon), lessee of the wheel and trailer at the time of the explosion. Zacher's wife also sought damages in this action.

### Statement of Facts

The multi-piece truck wheel (wheel) which exploded consisted of a disc and rim assembly and a side ring and lock ring assembly. The disc and rim assembly is commonly thought of as the wheel. The side ring and lock ring are affixed to each other by two rivets. The rim was designed and manufactured by Firestone Tire & Rubber Company (Firestone), and the disc portion was designed and manufactured by Budd. In 1951, Budd permanently riveted these parts together and thereby constructed the disc and rim assembly which was part of this particular wheel. The side ring and lock ring assembly, which made up the third component of the multi-piece wheel, was manufactured by Firestone sometime before 1946.

Single-piece rims are used when tubeless tires are used. The record discloses that tubeless tires were not feasible on passenger cars until the early 1950's. Following this, trucking operations became interested in tubeless tires for trucks.[1] Single-piece tire rims and tubeless tires for trucks were developed in 1953 and first produced in 1954.

The evidence showed that the side ring and lock ring assembly did not match the disc and rim assembly manufactured by Budd. There was no evidence, however, to show that Budd incorrectly combined its disc and rim assembly with the side ring and lock ring assembly on this particular wheel. Indeed, the only evidence presented showed that they correctly assembled the wheel.

At some time, the disc and rim assembly involved in this accident, and manufactured by Budd, was mismatched with a side ring and lock ring assembly. Firestone designed and manufactured this particular side ring and lock ring assembly to fit an older model rim. The two components did not fit together properly: the ring assembly tongue could not be completely seated into the disc and rim assembly gutter, the combination of which increased the possibility of an explosion. Not only were the components mismatched, but these mismatched components themselves were out of round. The danger of explosion exists when the wheel unit is combined with a tire. As the tire (or tube) is inflated, the tire-wheel assembly becomes a "pressure vessel" with substantial stored energy wanting to escape. All tire-wheel units, whether initially single- or multi-piece wheels, pose some danger of explosive disassembly. However, the danger increases in a multi-piece wheel when its components are mismatched.

This wheel had also been physically altered from the condition in which it left Budd's hands. As manufactured and distributed, the valve stem slot did not extend to the edge of the disc and rim assembly. Someone using a chisel or torch had lengthened the slot on this Budd assembly to extend it to the edge of the wheel.

On August 2, 1978, this wheel was on a trailer owned by Yellowstone, a trucking company which owned fourteen over-the-road tractors and approximately thirty trailers at that time. Yellowstone's primary contracts were seasonal and during the off-season it leased its equipment to other trucking companies on short-term leases of less than thirty days. Yellowstone leased the trailer on which this wheel was mounted to Dixon on August 2, 1978. A Yellowstone driver, on Yellowstone's payroll, drove the vehicle for Dixon. The lease provided that the equipment was in "first-class condition" and would be so maintained by Yellowstone during the term of the lease. Before the lease was signed, a Dixon employee inspected the trailer and found a flat tire on an inside dual. Two Yellowstone drivers drove the vehicle to the Windmill, the shop which serviced tires on Yellowstone trucks when they were in the area. Windmill held itself out to the public as a competent and qualified truck tire repair service.

### a. Trial Testimony

Zacher was experienced in repairing flat tires and in the disassembly and reassembly of large truck wheels. From the time he began work as a service station attendant at the Windmill, some nine to ten months earlier, Zacher ordinarily repaired approximately five flat truck tires per day. He had also worked with multi-piece wheels at two other jobs prior to his employment with Windmill. The Windmill was not a distributor of new or used truck wheels or components. There were no catalogs, matching charts, or other literature concerning truck wheels available to Zacher at the Windmill. From time to time, defendant Budd issued cautionary literature but distributed it only to its own distributors and not to truck stops or service

---

1. Zacher argues that the knowledge and capability to manufacture single-piece wheels for both cars and trucks existed before that time, but that the industry itself limited the use of single-piece wheels to cars.

stations. Neither the general manager of the Windmill, Darrell Lich, nor Zacher, had ever seen that type of literature before the accident or prior to their pretrial depositions. The only document which Zacher had ever seen before the accident was a poster that hung on the wall at the Windmill which merely reminded workers to be careful with multi-piece wheels.

A "safety cage" was provided for Windmill employees while they worked on truck wheels with inflated tires. Zacher always used the safety cage. As an added precaution, before removing such a wheel from the safety cage after inflation of the tire, he rotated it several times on rollers at the bottom of the cage and visually examined the entire circumference of the wheel to make sure the side ring and lock ring were properly seated on the rim.

LeRoy Iverson, Yellowstone's general manager and acting safety engineer, testified that about one year before the August 1978 accident, Yellowstone had leased the subject trailer to Consolidated of Spokane, Washington. During that lease, about eight new tires were installed on the trailer. It was his belief that the old multi-piece wheel involved in the accident was substituted onto the trailer when those eight tires were installed in Washington. He stated that the wheel and eight or ten others just like it, may also have been placed on the trailer by either Emil Rennich, an independent tire repairman whose services were customarily used by Yellowstone, or by one of Yellowstone's own shop employees. He conceded the wheel was unsafe and should have been culled out of the fleet and thrown away.

It was conceded by all expert witnesses who testified, including representatives from all defendants, that this multi-piece wheel was not in "first class condition", was unsafe, and posed the risk of an explosive disassembly.

John Haug, manager of Budd's wheel engineering department, testified that both pieces of this wheel, (the rim-disc portion and the separate side ring and lock ring), had outlived their average useful life expectancy of between ten and fifteen years. Additionally, he stated that the side ring and lock ring assembly was the wrong size and type. The side ring and lock ring was a 7.33 V "R" and the rim-disc assembly was a model # 59930, 7.5 "R 5°" size and type. Although a person like Zacher working in a service station would not see a cross sectional drawing of such a "mismatch", Budd had one [2] prepared for trial. This drawing illustrates that, when viewed from that prospective, the separate components do not fit together properly. Haug concluded that they should not have been used together because the mismatch increased the likelihood of an explosive disassembly. Before the accident, the specific mismatch in question had been recognized in Budd's cautionary literature as a "foreseeable" mismatch.

2. See defendant's Exhibit 38.

126

SUPREME COURT
STATE OF SOUTH DAKOTA
F I L E D

OCT 2 3 1984

Clerk

There was nothing in any of the literature which Budd had distributed during the twenty years or so prior to the accident to assist a tire repairman in determining

whether the model # 59930 rim-disc was type "R" or a "R 5°," so that a mismatch of parts could be detected or avoided. Moreover, this rim-disc assembly and the side ring and lock ring assembly were devoid of any imprinted designation of their type or style. An examination disclosed the absence of any "R" or "R 5°" designation on either of them. Mr. Haug conceded that for the cost of a few cents in mass production, a short, meaningful message such as "R 5°: Use only R 5° ring," could have been indelibly imprinted on the rim-disc assembly.

Neil Burgess, one of Dixon's shopmen, testified that when repairing a flat or changing a tire, he always put the same side ring and lock ring, which had been removed, back onto the rim-disc. He also stated that every careful service station attendant should always reinstall the same ring that was removed.

Dan Litzsinger, a Yellowstone employee, testified that Yellowstone had a company policy or rule that its drivers were never to permit a service station attendant to substitute equipment when repairing a flat tire. Yellowstone employees were told to make sure that the same rim and ring that comes off the rig goes back on it. Litzsinger further stated that even an experienced shopman would be unable to tell by visual examination, absent appropriate markings, whether this side ring and lock ring and the rim-disc assembly matched one another.

Phil Peterson, another Yellowstone driver, came back to the Windmill approximately one month after the accident. He advised Darrell Lich, Windmill's manager, that after this tractor-trailer was returned to Yellowstone, upon inspection, six more wheels just like the one involved in the accident were found on the vehicle and removed.

Another Yellowstone driver-employee named Schuman, hung around the shop most of the time and watched Zacher perform the repair job. Schuman testified that Zacher did nothing wrong and appeared to be a skilled tire repairman. Zacher used all of the proper safety equip-

ment and put the same side ring and lock ring back onto the rim-disc that Schuman had brought in together. Zacher made no substitutions.

After the tire was repaired, the wheel reassembled, and the tire inflated, Zacher rotated the wheel several times on the rollers at the bottom of the safety cage and inspected the entire circumference of the wheel to make sure that the ring was properly seated on the rim. Zacher next took the wheel out of the safety cage, rolled it over to the trailer, used some bars to elevate it back onto the hub, and by hand started the installation of the lug nuts. Just as he began tightening the lug nuts down with an air gun, an explosion occurred. The next thing Zacher remembered was waking up on the floor of the shop in a lot of pain. He looked at one foot and saw that it was turned completely around on his leg—pointing in the wrong direction. He also noticed that one arm had been badly injured. He believed that he had lost the arm.

Zacher was hospitalized on four separate occasions for a total of forty-eight days. After several surgical procedures on his arm and leg, his medical expenses totaled $19,300.05. Claimed past and future economic losses amounted to between $634,990 and $970,670. He was permanently disabled from engaging in a line of work which required heavy lifting or subjected his arm or leg to any bad bumps or jars.

Professor William Groves, head of the mechanical engineering department at the South Dakota School of Mines & Technology, testified as an expert witness for the plaintiffs. He testified that the elongation of the valve stem slot caused a loss of 27 of 28ths of its rigidity which contributed to causing the explosive disassembly of the components of the wheel; that the wheel was comprised of mismatched components; and that the wrong size and type of side ring and lock ring had been used on Yellowstone's rim. In his opinion, the mismatch also contributed to the explosive disassembly of the ring from the rim.

Professor Groves further testified that the manufacturer's failure to properly identify the component parts, by the use of either an indelible imprint stamped into the steel, color coding, or the use of an interlocking, matching locator pin and hole, fell below an acceptable standard of care from the standpoint of safety. His examination disclosed that the model number [59930] of the rim had been indelibly imprinted onto the rim and was still visible after years of use. He testified that it would have been feasible, and would not have affected the integrity of the rim, for Budd to have had the rim indelibly imprinted with a warning such as "R 5°: Use only R 5° ring." According to Professor Groves, the absence of such an imprinted warning similarly contributed to causing the mismatch of components and the ensuing explosive disassembly. He stated that the quantity of energy impounded within an inflated truck tire is more than the energy generated by the explosion of a "stick of dynamite." He also expressed the opinion that "single-piece" truck wheels were and are safe, and that multi-piece wheels are inherently defective and unreasonably dangerous.

b. Trial Motions and Rulings

During trial, cautionary instructions which were requested and given, advised the jury that it must not consider certain evidence against Yellowstone and Dixon. This evidence was notice to the wheel industry of prior accidents caused by explosive disassembly of multi-piece wheels, recognition by the wheel industry of the fact that multi-piece wheels were dangerous, and comments contained in the articles used by counsel for Budd during cross- and re-cross examination of Professor Groves, (that all multi-piece wheels are inherently defective and unreasonably dangerous). Zacher objected to the cautionary instructions. Zacher argued that it was unfair to allow the jury to use such knowledge against Zacher on the issues of contributory negligence and assumption of the

risk, but not allow the jury to impute the same to defendants Yellowstone and Dixon on the issue of negligence, especially when there was no evidence that Zacher had knowledge of that information.

Budd moved the trial court for summary judgment on all three theories of liability. These motions were denied. Budd additionally moved for summary judgment based upon the six year product liability statute of limitations, SDCL 15–2–12.1. This motion was also denied.[3] Yellowstone and Dixon requested summary judgment on the strict liability and breach of warranty causes of action on grounds that they did not manufacture or sell the multi-piece wheel that exploded. All three defendants moved the trial court for summary judgment on the punitive damage counts based on the absence of any evidence of willful or wanton misconduct. *See:* SDCL 21–3–2.

Prior to trial, the trial court granted all three defendants summary judgment on the punitive damages count and granted Yellowstone and Dixon summary judgment on the strict liability and breach of warranty counts. Following presentation of evidence to the jury, the trial court granted Budd's motion to dismiss the breach of implied warranty count.

The questions of whether Budd, as the manufacturer and seller of the disc and rim assembly, was liable on strict liability grounds and whether any of the three defendants were liable for negligence went to the jury. The trial judge believed there was a genuine issue of material fact as to whether Yellowstone or Dixon made a reasonably thorough inspection prior to and after exchange of the trailer. The jury was also asked whether Zacher's claims against Budd were barred by SDCL 15–2–12.1. They returned a special verdict and found that none of the three defendants had been negligent and that Budd was not liable to Zacher under the strict liability theory. The jury also decided that Zach-

---

**3.** The trial court's denial of Budd's motions for directed verdict on the basis of the six year statute was solely based on the existence of a fact question concerning whether the product

had been delivered for use more than six years prior to the occurrence as the evidence did not disclose any exact information on date of delivery.

er's claims against Budd were barred by the product liability statute of limitations.

The trial court then ordered Zacher's action dismissed on the merits and that the defendants should recover their costs of the action, including their costs for taking depositions. Zacher moved the court for a judgment notwithstanding the verdict or in the alternative for a new trial, and objected to the taxation of costs. A hearing was held, Zacher's motions were denied, and the costs of most of the depositions were taxed. Zacher appeals from the final judgment, the denial of his motion for judgment notwithstanding the verdict, and the taxation of depositions costs.

### c. Issues

Zacher raises eight issues on appeal and urges that the trial court committed prejudicial error when it:

(1) applied and instructed the jury on SDCL 15–2–12.1, the six year product liability statute of limitations;

(2) instructed the jury that defendants were not liable if they complied with industry and governmental standards;

(3) gave its own instructions to the jury rather than Zacher's proposed instructions;

(4) granted motions for summary judgment on breach of warranty and strict liability to Yellowstone and Dixon and refused to instruct on breach of warranty against Budd;

(5) allowed defense counsel to read certain publications before the jury;

(6) denied Zacher's request to hear a rebuttal witness;

(7) refused to instruct the jury that defendants' violation of safety statutes and rules constituted negligence per se; and

(8) taxed Zacher with defendants' costs of the action, including their costs of depositions.

These issues are discussed in the above order as follows:

1. SINCE THE COURT'S INSTRUCTIONS WERE BASED ON PRIOR LAW AND THE SIX YEAR PRODUCT LIABILITY STATUTE OF LIMITATIONS, WHICH WAS SUBSEQUENTLY RULED UNCONSTITUTIONAL, ZACHERS ARE ENTITLED TO A NEW TRIAL

██ In reliance upon prior law and the six year product liability statute of limitations,[4] SDCL 15–2–12.1,[5] the trial court

---

4. SDCL 15–2–12.1 provides:

In the application of any statute of limitations to a cause of action against a manufacturer, lessor or seller of a product, regardless of the substantive legal theory or theories upon which the action is brought, for or on account of personal injury, death, or property damage caused by or resulting from the manufacture, construction, design, formula, installation, inspection, preparation, assembly, testing, packaging, labeling, or sale of any product or failure to warn or protect against a danger or hazard in the use, misuse or unintended use of any product, or the failure to provide proper instructions for the use of any product, the cause of action shall be barred if it accrues more than six years after the date of the delivery of the completed product to its first purchaser or lessee who was not engaged in the business of selling such product, regardless of the date the defect in the product was or should have been discovered. This section shall not apply to causes of action which have arisen prior to July 1, 1978.

This statute was repealed in 1985. *See:* 1985 S.D.Sess.Laws, ch. 157, § 2 and discussion of the history of this statute, *infra.*

5. Although SDCL 15–2–12.1 is referred to as a statute of limitations, it may operate, as it did in this case, as a statute of repose or nullification. A statute of limitations requires a lawsuit to be filed within a specified period of time after a legal right has been violated or the remedy for the wrong committed is deemed waived. A statute of repose bars all actions after a specified period of time has run from the occurrence of some event other than the occurrence of an injury that gives rise to a cause of action. All statutes of limitation must proceed on the idea that the party has full opportunity afforded him to try his right in the courts. However, since a statute of repose begins to run from a date unrelated to the date of an injury, it is not designed to allow a reasonable time for the filing of an action once it arises. Therefore, a statute of repose may bar the filing of a lawsuit even though the cause of action did not even arise until after it was barred and even though the injured person was diligent in seeking a judicial remedy. *Berry v. Beech Aircraft,* 717 P.2d 670, 672 (Utah 1985).

submitted Instruction #36[6] to the jury. The jury found that Zacher's claims against Budd were time barred by the statute of limitations. However, SDCL 15–2–12.1 was declared unconstitutional in *Daugaard v. Baltic Co-op Building Supply Ass'n.*, 349 N.W.2d 419 (S.D.1984). Therefore, through no fault of the trial court, Instruction #36 was erroneous and a new trial must be granted.

■ Budd argues that even if Instruction #36 was erroneous, it was not prejudicial error irrespective of SDCL 15–2–12.1, because the jury determined that Budd was not liable to Zachers under the theories of strict liability or negligence. We have examined the special verdict form, the jury's question concerning same, and the court's answer thereto.[7] We conclude that the jury's determination that Budd was not liable to Zacher was clearly based upon the statute of limitations instruction, and not solely on the separate basis of either strict liability or negligence. Therefore, we reject Budd's argument.

*Daugaard* concerned consolidated actions, all of which arose out of a propane gas explosion and fire at the Baltic grain elevator. 349 N.W.2d at 419. The trial court entered summary judgment against the plaintiffs who had suffered severe injuries in the explosion-fire, and the executrix of one who perished from his injuries. *Id.* at 424. The court rested its decision on the application of two statutes: SDCL 15–2–9, the six year statute of limitations for deficiencies in construction of improvements to real property, and SDCL 15–2–12.1, the six year product liability statute of limitations. On appeal, the plaintiffs asserted that these statutes unconstitutionally "locked the courtroom door" before they had an opportunity to open it. *Id.* at 424. We wrote:

> Our constitution, as enacted by our forefathers and occasionally amended, is solid core upon which all our state laws must be premised. Clearly and unequivocably, our constitution directs that the courts of this state shall be open to the injured and oppressed....
>
> SDCL 15–2–9 and SDCL 15–2–12.1 are a locked deadbolt and shackle on our courtroom doors. We are unwilling to couch SDCL 15–2–9 and SDCL 15–2–12.1 in wishful language which portends their effect is somehow constitutional. SDCL 15–2–9 and SDCL 15–2–12.1 are statutes of nullification which stamp out our citizens' causes of action before they accrue. SDCL 15–2–9 and SDCL 15–2–12.1 have transgressed constitutional limitations

---

6. Instruction #36 provides:

> You are instructed that, under the laws of the State of South Dakota, the causes of action asserted by plaintiffs against the defendant, The Budd Company, are barred if you find from the evidence that the disc-rim assembly involved in this case was delivered to its first purchaser or user (who was not engaged in the business of selling such product) more than six years prior to the date of the accident, which accident in this case occurred on August 2, 1978. Thus, if you find that the wheel assembly was delivered to its first purchaser or user (who was not engaged in the business of selling such assembly) prior to August 2, 1972, then you must return a verdict in favor of Defendant The Budd Company. Since the statute of limitations has been asserted as an affirmative defense by Defendant The Budd Company, it has the burden of proving this defense.

7. The special verdict form provided:

1. Do you find Defendant, The Budd Company, liable to Plaintiff under either of the following theories?

| | Yes | No |
|---|---|---|
| Strict Liability | | x |
| Negligence | | x |

[Questions 2 & 3 omitted]

4. Do you find that the Plaintiffs' claims against The Budd Company are barred by the statute of limitations?

| | Yes | No |
|---|---|---|
| | x | |

Before answering the above questions, the jury submitted the following question to the court:

> Question: Does answering "yes" to #4 automatically force us to answer "no" to #1 on both counts. See verdict form.
> Answer: If you answer "yes" to question #4, it will bar the Plaintiffs' claims against Defendant, The Budd Company.
>
> December 12, 1983
> /s/ Marshall Young

and therefore it is our duty to declare these two statutes unconstitutional.[8]

*Id.* at 425.

Based upon the "open courts" provision [9] of the South Dakota Constitution, the *Daugaard* court declared the statutes unconstitutional, and in doing so, reversed the summary judgments and remanded for trial. *Id.* at 427.

*Daugaard* has been followed by the Supreme Court of Arizona in *Kenyon v. Hammer*, 688 P.2d 961 (Ariz.1984),[10] and by the Supreme Court of Utah in *Berry v. Beech Aircraft*, 717 P.2d 670 (Utah 1985).

In *Berry*, decedent's wife and children filed a wrongful death action against an airplane manufacturer predicated upon the theories of negligence, strict liability, and breach of warranty. 717 P.2d at 671. The decedent died in an airplane crash. The aircraft was approximately twenty-three years old at the time of the crash, and had been purchased by its current owner some nine years earlier. The trial court awarded Beech summary judgment on all theories of liability based on the statute of repose contained in section 3 of Utah's Product Liability Act (Act).[11] *Id.* at 671–672.

On appeal, the appellants claimed that section 3 was unconstitutional because it violated the Open Courts Clause [12] of the Utah Constitution. *Id.* Characterizing section 3 as "sweeping and absolute once the statutory period has elapsed," the court held that the elimination of all causes of action after the period specified in the statute, without regard to when an injury occurred, was arbitrary, unreasonable, and unconstitutional as violative of the Open Courts Clause of the Utah Constitution.

---

**8.** The *Daugaard* opinion was not the first to express disapproval of this statute. In *McMacken v. State*, 320 N.W.2d 131, 140, *aff'd on rehearing*, 325 N.W.2d 60 (S.D.1982), Justice Dunn dissented, writing in part, "I am convinced that SDCL 15-2-9 is not a statute of limitations. Statutes of limitation proceed on the theory that a plaintiff has a full opportunity to try his rights in the courts within certain time limits. This statute bars all recovery without allowing any time for the commencement of an action, if the action accrues six years following the completion of a building. No action by plaintiff can remedy the situation."

**9.** South Dakota Constitution art VI, § 20 provides:

All courts shall be open, and every man for an injury done him in his property, person or reputation, shall have remedy by due course of law, and right and justice, administered without denial or delay.

**10.** In this case, the mother of a stillborn child brought a medical malpractice action against a physician based on his vicarious liability for the alleged negligence of his nurse. The mother commenced suit for the wrongful death of her child and her own bodily injuries. The trial court entered summary judgment for the physician based on Arizona's statute of limitations for medical malpractice actions. 688 P.2d at 963–964. In reversing and holding the wrongful death action maintainable, the court noted that jurisdictions that have rejected statutes of repose are those which contain "open courts" provisions in their state constitutions. *Id.* at 965. After quoting from *Daugaard,* the court held:

Given the specific provisions of the Arizona Constitution—stronger than the open court provisions in the Constitutions of South Dakota, Florida, North Carolina, Kentucky and Alabama—we believe that any statute which bars a cause of action before it could legitimately be brought abrogates rather than limits the cause of action and offends ... the Arizona Constitution.

*Id.* at 966–967.

**11.** Section 3 of the Act provides:

(3) No action shall be brought for the recovery of damages for personal injury, death or damage to property more than six years after the date of initial purchase for use or consumption, or ten years after the date of manufacture of a product, where that action is based upon or arises out of, any of the following: (a) Breach of any implied warranties; (b) Defects in design, inspection, testing or manufacture; (c) Failure to warn; (d) Failure to properly instruct in the use of the product; or (e) Any other alleged defect or failure of whatsoever kind or nature in relation to a product.

**12.** Article I, section 11 of the Utah Constitution provides:

All courts shall be open, and every person, for an injury done to him in his person, property, or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this state, by himself or counsel any civil cause to which he is a party.

*Id.* at 681.[13]

In Zacher's case, SDCL 15–2–12.1 began to run from the date of the first sale of the multi-piece wheel. Budd constructed the disc-rim assembly in 1951. The side ring and lock ring assembly was manufactured by Firestone sometime before 1946. The jury found that this multi-piece wheel was delivered to its first purchaser(s) more than six years before the accident. The explosion which injured Zacher did not occur until August 2, 1978. On its face, SDCL 15–2–12.1 operated to time bar *any* action against Budd which occurred more than six years after the wheel was delivered to its first purchaser. More importantly, however, it operated here to bar Zacher's cause of action before it even existed, and even though he was diligent in seeking a judicial remedy. As such, the operation of SDCL 15–2–12.1 afforded Zacher no time nor opportunity to try his rights in court. Therefore, based upon the foregoing authorities, and the evidence before us, we find that Instruction #36 unlawfully extinguished Zacher's right to seek redress for his injury before it even arose, and thus, denied him justice.

It is interesting to note the history of SDCL 15–2–12.1 since *Daugaard, supra.* As indicated above, *Daugaard* ruled the statute unconstitutional in 1984. In 1985, the statute was repealed by section 2, chapter 157 of the 1985 Sessions Laws.

In addition, and in its place, the 1985 Legislature enacted SDCL 15–2–12.2 as follows:

An action against a manufacturer, lessor or seller of a product, regardless of the substantive legal theory upon which the action is brought, for or on account of personal injury, death or property damage caused by or resulting from the manufacture, construction, design, formula, installation, inspection, preparation, assembly, testing, packaging, labeling or sale of any product or failure to warn or protect against a danger or hazard in the use, misuse or unintended use of any product, or the failure to provide proper instructions for the use of any product may be commenced only within three years of the date when the personal injury, death or property damage occurred, became known or should have become known to the injured party.

This section is prospective in application.

Source: 1985 S.D.Sess.Laws, ch. 157, § 1.

By its terms, this statute is prospective in application. As such, it does not apply to this case, but at a minimum, it does:

1. impliedly affirm the decision in *Daugaard* by adopting the *Daugaard* rationale in providing a three year statute of limitations from the time of the personal injury, death or damage;

2. provide a smooth transition for South Dakota product liability law;

3. quiet *Daugaard's* critics by attempting to settle the future.

*Daugaard's* first critic was Justice Wollman, who dissented in part as follows: "It will be interesting to see whether the life span of today's majority opinion will be as ephemeral as the composition of the court

---

13. For other decisions holding statutes of limitation or repose violative of open courts provisions, *see: Kennedy v. Cumberland Engineering Co.,* 471 A.2d 195 (R.I.1984) (products liability); *Nelson v. Krusen,* 678 S.W.2d 918 (Tex.1984) (medical malpractice); *Heath v. Sears, Roebuck & Co.,* 123 N.H. 512, 464 A.2d 288 (1983) (products liability); *Lankford v. Sullivan, Long & Hagerty,* 416 So.2d 996 (Ala.1982) (products liability); *Diamond v. E.R. Squibb & Sons,* 397 So.2d 671 (Fla.1981) (products liability); *Bolick v. American Barmag Corp.,* 54 N.C.App. 589, 284 S.E.2d 188 (1981); *modified and affirmed,* 306 N.C. 364, 293 S.E.2d 415 (1982) (products liability); *Phillips v. ABC Builders, Inc.,* 611 P.2d 821 (Wyo.1980) (builders statute of repose); *Over-* *land Construction Co. v. Sirmons,* 369 So.2d 572 (Fla.1979) (engineers, architects and builders); *Saylor v. Hall,* 497 S.W.2d 218 (Ky.1973) (builders statute of repose). *See also: Wright v. International Harvestor,* 736 F.2d 483 (8th Cir.1984). Additionally, we recognize that other cases have held statutes of repose constitutional under open courts provisions. *See: Tetterton v. Long Manufacturing Co.,* 314 N.C. 44, 332 S.E.2d 67 (1985) (products liability); *Davis v. Whiting Corp.,* 66 Or.App. 541, 674 P.2d 1194 (1984) (products liability); *Dague v. Piper Aircraft Corp.,* 275 Ind. 520, 418 N.E.2d 207 (1981) (products liability); *Thornton v. Mono Mfg. Co.,* 99 Ill.App.3d 722, 54 Ill.Dec. 657, 425 N.E.2d 522 (1981) (products liability).

that produced it. However long-lived today's interment of *McMacken,* the decision will do nothing to add to this court's reputation for constancy, consistency, and reasoned elaboration." *Daugaard,* 349 N.W.2d at 428.

We submit that this court's reputation for constancy, consistency, and reasoned elaboration has in fact been strengthened by the Legislature's enactment of SDCL 15–2–12.2. More importantly, however, SDCL 15–2–12.2 recognizes and approves this court's earnest search for constitutional fairness.

Accordingly we hold that the trial court's instruction was erroneous, and we reverse and remand for a new trial.

2. IS COMPLIANCE WITH INDUSTRY, ASSOCIATION AND GOVERNMENT STANDARDS CONCLUSIVE?

The next question is whether the trial court committed error when it instructed the jury that defendants were not liable if they complied with industry, association, and governmental standards.

 Zacher complains that the trial court gave Instructions 20, 21 and 33 over his objections, and that collectively these instructions amounted to a directed verdict for Budd, if Budd complied with the standards of their own industry, voluntary association, or governmental bodies. Zacher points out that the instruction was contrary to South Dakota law, universal law, and argued that no industry or voluntary association may, in fact, adopt its own standards as conclusive. That is, industry standards are merely a minimal standard that may be considered, and Instruction # 20 states that it is a conclusive standard. We agree. *See: Turner v. American Motors General Corp.,* 392 A.2d 1005, 1007 (D.C. Ct.App.1978) ("Compliance with a legisla-

tive enactment or administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precaution."); *Potter v. Battle Creek Gas Co.,* 29 Mich.App. 71, 185 N.W.2d 37, 39 (1970) ("[H]ad the defendant violated one, or more, of the standards of the commission that fact might be deemed to be proof of negligence or evidence of negligence, it does not follow that coming within the standards ... insulates defendant from a finding of negligence."). *See also:* Restatement (Second) of Torts § 295A (1965) ("In determining whether conduct is negligent, the customs of a community, or of others under like circumstances, are factors to be taken into account, but are not controlling where a reasonable man would not follow them.").[14]

Therefore, the trial court's instructions, that compliance with standards exonerated the defendants from liability, were clearly prejudicial and reversible error.

Additionally, plaintiffs proposed Instruction # 2 instead of the instructions mentioned above:

In determining whether the defendants were guilty of negligence for failure to use reasonable care in connection with the performance by them of the duties which they owed to the plaintiffs as elsewhere defined in these instructions, you may consider whether the defendants followed or complied with the standards and customs of their own industry or trade. *However,* compliance with such legislative enactments, rules or regulations and/or compliance with the standards and customs of their own industry or trade are not controlling and does not prevent you from finding them negligent if a reasonable man in the position of the defendants would or reasonably should have taken additional precautions.

---

**14.** Comment c on this section states:
No group of individuals and no industry or trade can be permitted, by adopting careless and slipshod methods to save time, effort, money, to set its own uncontrolled standard at the expense of the rest of the community.... [W]henever the particular circumstances, the risk, or other elements in the case are such that a reasonable man would not conform to the custom, the actor may be found negligent in conforming to it; and whenever a reasonable man would depart from the custom, the actor may be found not to be negligent in so departing.

Whenever under particular circumstances and in view of the risk involved a reasonable person would depart from the customs and standards of a particular industry or trade or take precautions additional to those required by a legislative enactment, rule or regulation, such a defendant may be found negligent if it fails to so depart or take such additional precautions. (emphasis in original).

In view of the facts and circumstances of this case, proposed Instruction #2 was an accurate statement of the applicable law and should have been given by the trial court instead of the erroneous instructions mentioned above. The last paragraph of Instruction #33 properly instructed the jury that compliance with [governmental] regulations could be considered as evidence of the exercise of reasonable care by Yellowstone and Dixon but was not conclusive on the issue of negligence. However, this instruction did not correct the error in respect to the conclusiveness of standards of industry and voluntary associations. Therefore, this error relates not only to the negligence claims against Budd but also against the defendants Yellowstone and Dixon.

3. FORESEEABLE PRODUCT MISUSE, MISMATCH OR CHANGE DOES NOT RELIEVE THE MANUFACTURER OF ALL LIABILITY NOR ITS DUTY TO WARN

Zacher contends that the trial court committed reversible error by giving Instruction #19,[15] and compounded the error by refusing to give his proposed Instructions 5 through 10 and 18.[16] Zacher objected to Instruction #19 because it provided that Budd, the manufacturer, *must* not be found liable to the plaintiffs if its product reached Zacher with "any substantial change" in its condition from the time it left Budd's control, or if "subsequent misuse or other causes" made the product harmful or dangerous. According to Zacher, this instruction misstated the law because neither Instruction #19, nor any other instruction covered the required modifying issues of "foreseeability" or "intervening cause." Therefore, Zacher argues that the trial court erred in refusing to give his proposed instructions.

Not all substantial changes in the condition of a product will relieve the manufacturer of liability; nor will misuse of a product necessarily relieve the manufacturer of such liability under all circumstances. The overriding consideration ignored by the trial court's instructions concerning both the alleged substantial changes or alterations to the subject wheel, and its alleged misuse, was the doctrine of foreseeability.

In *Olson v. A.W. Chesterton Co.*, 256 N.W.2d 530 (N.D.1977), a conveyor belt operator sustained personal injuries after applying a belt dressing to the conveyor belt upon which he was working. Thereafter, he brought an action against the manufacturer of the belt dressing based on the theory of strict liability in tort. Because the warning on the belt dressing container required application by pouring it slowly over the running belt, and the operator

---

**15.** Instruction #19 provides in part:

With respect to the claimed defective condition of the disc-rim assembly involved in this case, you are instructed that subject to the defenses previously indicated, a manufacturer of a product is liable for damages proximately caused by its product if,

First, it was in a defective condition;

Second, the defective condition made the disc-rim assembly unreasonably dangerous to the Plaintiff, James H. Zacher;

Third, the defect existed at the time it left the control of the Defendant, The Budd Company;

*Fourth, the disc-rim assembly was expected to and did reach the Plaintiff, James H. Zacher,* *without any substantial change in the condition it was in when it left the control of the Defendant, The Budd Company, and*

Fifth, the Plaintiff, James H. Zacher, used the product in a manner in which the Defendant, The Budd Company, could reasonably anticipate it would be used....

*The Budd Company is not liable if it delivers a product in a safe condition and subsequent misuse or other causes make such product harmful or dangerous....* (emphasis added).

**16.** Zacher's proposed Instructions 5 through 10 and 18 would have modified Instruction #19 by providing for foreseeability, intervening acts, superseding causes, and other events.

squirted it directly upon one of the top drive pulleys, the manufacturer argued that the operator's method of application constituted misuse of the product, thus relieving them of liability. The court held:

It is now well-settled that one who manufactures or sells a product has a duty not only to warn of dangers inherent in its intended use, but also to warn of dangers involved in a use which can be reasonably anticipated.

*Id.* at 535.

The court found this dual responsibility applicable to product liability cases based not only on negligence, but on strict liability as well. Regarding the latter theory, the court quoted in part from *Thomas v. General Motors Corp.*, 13 Cal.App.3d 81, 91 Cal.Rptr. 301, 306 (1970) and stated:

Although it is incumbent on a plaintiff seeking to impose strict liability to establish that he was injured while using the product in a way it was intended to be used ... a manufacturer may be held liable where the misuse by the customer was reasonably foreseeable.... Whether the use or misuse of a product by the plaintiff was reasonably foreseeable is ultimately a jury question.

■ Here, the trial court gave no instructions to the jury that Budd's "duty to warn" applied to the theory of strict liability. Instead the court gave a duty to warn instruction which was limited in its application to the theory of negligence. Since the testimony of Professor Groves was that the manufacturer's failure to indelibly imprint cautionary information upon the rim and ring contributed to the subsequent explosion, the failure to give a duty to warn instruction, broad enough to encompass strict liability, constituted reversible error under the *Olson* rationale.

■ This court has held that the issue of foreseeability is a fact issue for the jury, not an issue of law for the court. *Rikansrud v. City of Canton*, 79 S.D. 592, 116 N.W.2d 234 (1962). Thus, even if a plaintiff is assumed contributorily negligent, whether that intervening force supersedes the defendant's negligence is for the jury

to decide. *Id.* 79 S.D. at 604–608, 116 N.W.2d at 240–242. Similarly, in *Vanskike v. ACF Industries, Inc.*, 665 F.2d 188 (8th Cir.1981), *cert. denied*, 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982), the court stated:

The law recognizes that there can be strict liability of a supplier even though the product is altered or changed if it is foreseeable that the alteration would be made and the change does not unforeseeably render the product unsafe.

*Id.* at 203–204, quoting from *Hales v. Green Colonial, Inc.*, 490 F.2d 1015, 1020 (8th Cir.1974).

In *Griggs v. Firestone Tire & Rubber Company*, 513 F.2d 851 (8th Cir.) *cert. denied*, 423 U.S. 865, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975), the court held that where there exists both a design defect and misuse of the product, and it is assumed that each contributes to an accident, the misuse of the product is not an intervening cause if the misuse was foreseeable. *Id.* at 861–862. Griggs was a service station attendant who sustained personal injuries when a tire and rim assembly exploded as he was attaching a multi-piece wheel to a truck. He sued the rim manufacturer based on negligence. The case was tried before a jury and plaintiff was awarded $250,000 in damages. On appeal, the manufacturer, Firestone, raised questions concerning its duty to warn Griggs of the possibility of an explosive disassembly. *Id.* at 853. Other similarities to the Zacher case are:

—A mismatch of component parts: a Firestone type "R" side ring and lock ring had been used on a "5°" (also known as a "R 5°") rim;

—The manufacturer conceded that the mismatched components were capable of being assembled together, and that such a mismatch was potentially dangerous;

—The only job that both service station attendants were employed to perform was to change flat tires;

—Both attendants reassembled the same mismatched parts presented to them;

—The absence of appropriate identifying marks or warnings indelibly imprinted directly upon the rim components;

—Testimony indicated that it was feasible, and would have been meaningful, to imprint a warning directly upon the steel rim components without affecting the integrity of the rim;

—The failure of warning literature distributed by the manufacturer to trickle down to service stations which repaired truck tires.

*Id.* at 853–856.

In *Griggs*, the manufacturer raised two issues on appeal. First, Firestone argued that it had fulfilled its "duty to warn" by distributing cautionary literature to its distributors only, and that it had no obligation to personally seek out and warn Griggs. Second, Firestone claimed that any assumed negligence arising out of a breach of its duty to warn could not have been the proximate cause of the explosion because the mismatch of the rim components consti-

tuted an independent, intervening act which constituted the superseding cause of the accident. *Id.* at 856. In rejecting the first contention, the court quoted from the Restatement (Second) of Torts § 388 (1965),[17] and then stated:

In the instant case we have no difficulty with the proposition that the jury reasonably could have found that defendant had not met its duty to exercise reasonable care. By any standard the danger inhering in defendant's product must be deemed great: there is an obvious potential for severe injury from wholly unanticipated explosion of a wheel assembly under great pressure in close proximity to the repairman. As Firestone acknowledges in its warning literature, the resulting harm may easily be grievous bodily injury or even death. Given this potential for severe injury, we cannot say as a matter of law that defendant discharged its duty through the informational literature which it supplied to the various parts distributors and automobile manufacturers using its rims.[18] To so hold would be to ignore the fact that the jury was not bound to consider such an informational campaign as necessarily equivalent to the exercise of reasonable care. As noted in the Restatement,[19]

---

**17.** § 388 of the Restatement (Second) of Torts provides:

One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

**18.** Although Firestone supplied warning literature to the immediate distributors of its rims, the court stated that the jury could have found that this informational campaign did not adequately "trickle down" to the many local dealers in Firestone products and the area service sta-

tions; therefore the informational campaign was not an adequate method for warning probable users of the rims. *Griggs,* 513 F.2d at 858 n. 5.

**19.** Restatement (Second) of Torts § 388, comment n at 309–310 states:

Since the care which must be taken always increases with the danger involved, it may be reasonable to require those who supply through others chattels which if ignorantly used involve grave risk of serious harm to those who use them * * *, to take precautions to bring the information home to the users of such chattels which it would be unreasonable to demand were the chattels of a less dangerous character.
. . . .
Thus, while it may be proper to permit a supplier to assume that one through whom he supplies a chattel which is only slightly dangerous will communicate the information given him to those who are to use it, unless he knows that the other is careless, it may be improper to permit him to trust the conveyance of the necessary information of the actual character of a highly

reasonable care may dictate that a warning be impressed directly on the article when (as here) the danger is great and such a warning would not be impracticable or unduly burdensome. Plaintiff presented testimony from which the jury could find that such a warning was practicable and, since Firestone already impresses identification information on its rim parts, the jury could obviously find that the impressing of additional warning information was not unduly burdensome. We believe the jury could reasonably have found that ordinary care required that a warning be impressed directly on this dangerous instrumentality.

*Id.* at 858–859.

Here Budd's own warning literature,[20] which was circulated to its immediate distributors, but never seen by Zacher, implicitly acknowledged that its product was "dangerous for the use for which it is supplied" and that those "for whose use the chattel is supplied" would not realize that dangerous condition. *See:* § 388, Restatement (Second) of Torts, *supra.* However, Budd vigorously disputes the claim that it failed to exercise reasonable care in warning Zacher of that danger. As noted in *Griggs, supra,* the Restatement comments indicate that the danger posed by a chattel may be so great as to make it unreasonable for a supplier to entrust conveyance of a warning to a middleman in the chain of distribution. In such circumstances, the supplier may be required, where "practicable and not unduly burdensome" to make the chattel carry its own warning. 513 F.2d at 858.

---

dangerous article to a third person of whose character he knows nothing....

[I]f the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom he has good reason to believe to be careful. Many such articles can be made to carry their own message ... indicating with a substantial sufficiency their dangerous character. Where the danger involved in the ignorant use of their true quality is great and such means of disclosure are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them.

**20.** A reprint of some of Budd's warning literature appears in plaintiff's Exhibit 53.

## How to Insure Greater Safety and Service
## by Properly Matching Side and Lock Rings

It is important to recognize that the various types of highway rims produced by their manufacturers all differ to some degree in design. This is particularly true of removable rings and, as a result, side and lock rings of different rim types are not interchangeable. Some may appear to be, but they actually do not fit properly on the rim base. Serious accidents to personnel have resulted from the use of mismatched rings.

The drawings below illustrate a few of the potentially dangerous conditions which can result from the mismatching of rings and bases.

### CORRECT

### INCORRECT

FIRESTONE 7.5 5° SIDE RING AND LOCK RING ON FIRESTONE 7.5 5° BASE

GOODYEAR 7.50V LW SIDE RING ON FIRESTONE 7.5 5° BASE — Loose Fit

FIRESTONE 7.5 5° SIDE RING AND LOCK RING ON GOODYEAR 7.50V LW BASE — Bead Seat Too High / Tire Will Not Fit Properly / Improper Seating

FIRESTONE 6.5 RH5° SIDE RING ON FIRESTONE 6.5 RH5° BASE — PROPER RIM WIDTH — Correct Fit

FIRESTONE 6.0 RH5° SIDE RING ON FIRESTONE 6.5 RH5° BASE — IMPROPER RIM WIDTH — Loose Fit

FIRESTONE 7.33V R SIDE AND LOCK RING ON FIRESTONE 7.33V R BASE — Correct Fit

FIRESTONE 7.5 5° SIDE RING AND LOCK RING ON FIRESTONE 7.33V R BASE — Bead Seat Too High / Tire Will Not Fit Properly / Improper Seating

FIRESTONE 7.33V R SIDE AND LOCK RING ON FIRESTONE 7.5 5° BASE — Loose Fit / No Support

FIRESTONE 7.5 FL5° SIDE RING ON FIRESTONE 7.5 FL5° BASE — PROPER RIM WIDTH — Proper Bead Seat Height

FIRESTONE 7.5 N5° SIDE RING ON FIRESTONE 7.5 FL5° BASE — Bead Seat Too High / Tire Will Not Fit Properly — IMPROPER RIM WIDTH

SUPREME COURT STATE OF SOUTH DAKOTA FILED OCT 23 1984 Clerk

PLAINTIFF'S EXHIBIT 53

---

The *Griggs* court further stated:

In closing our discussion of this issue, we observe that the necessity for rim disassembly is not an infrequent occurrence. The record indicates that a rim may last for twenty-six years or more, and that it probably will have to be disassembled at least once a year. In the life of any given rim, therefore, there are numerous occasions when components may be mis-

matched and a potential 'bomb' created. In calculating the warning appropriate to this danger, Firestone *assumed* that most people servicing its rims would realize the dangers presented and possess the requisite aptitude and experience to assemble the rim safely ... (emphasis in original).

... We cannot say as a matter of law that it was reasonable for Firestone to devise its method of warning according to this assumption regarding rim users. *Indeed, in view of the inevitability of rim disassembly and the practical fact that, at least in some cases, repair is bound to be undertaken, as here, by those not familiar with the particular dangers of these multi-piece rims, the jury could find that Firestone's assumption was unreasonable and that it failed its duty of care.* (emphasis added).

*Id.* at 859.

In the present case, testimony indicated that a reasonably prudent service station attendant who repairs a flat tire on a truck wheel should reassemble the same components and make no substitution of component parts. Zacher was experienced in working with multi-piece wheels. However, there were no discernible markings on the components which indicated their size and type. A mere visual examination did not disclose that they were not matching parts. Yet as stated by Professor Groves, Budd would have experienced minimal expense to have indelibly imprinted upon the wheel and rim the simple warning: "R 5 °: Use only R 5 ° ring." Indeed, Groves testified that the Firestone rim, which had been indelibly stamped with model number 59930, was still visible after years of use. Therefore, Budd may have breached its duty to warn under *Griggs, supra,* in view of the foreseeability of mismatched parts, the inherent danger therein, the failure of its warning literature to "trickle down" to service stations using its products, and the inability of even an experienced repairman to notice the mismatched parts.

In *Griggs,* Firestone asserted that legal causation had not been demonstrated because the mismatch of components constituted an independent intervening cause of Griggs' injuries. 513 F.2d at 861. The court stated:

[W]hether an intervening act will constitute an independent intervening cause is a question of foreseeability. (citations ommitted) ... Even where the act is the negligence of a third party, the act does not become a superseding cause where 'a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted.' Restatement (Second) of Torts § 447(b). Moreover, 'the law does not require precision in foreseeing the exact hazard or consequence' which in fact transpires; it is sufficient 'if what occurred was one of the kind of consequences which might reasonably be foreseen.' (citation omitted).

Thus, in rejecting Firestone's second contention, the court held:

In this case the alleged intervening cause—the mismatch of the rim components—was precisely the event against which Firestone warned in its safety literature. It does not matter that the exact manner in which the mismatch occurred was not foreseen. Firestone cannot argue that, as a matter of law, the precise danger which it contemplated was unforeseen. Accordingly, this contention must fail.

*Id.* at 862.

In addition, the fact that the valve stem slot was elongated to the edge of the rim did not, and need not have caused Zacher any concern. Jim Dixon, vice president of Dixon Brothers, testified that elongated valve stem slots were so common that a "reasonably prudent service station attendant" should "pay no attention" to them, and should "reinstall it or put it back together the same way as it came into ... [the] shop." Based on this evidence, the jury could find that the elongation of the valve stem slot before it reached Zacher's

hands was a "foreseeable" alteration, and that the alleged "misuse" by the mismatch of components was similarly foreseeable by Budd.

■ The trial court's Instruction # 19 advised the jury that *any* substantial change and *any* "subsequent misuse", rather than "unforeseeable" subsequent misuse, would necessarily relieve Budd of liability. As such, the trial court erroneously removed the issues of "foreseeability" and "intervening" or "superseding" cause from the jury despite evidence to the contrary. *See: Graham v. Joseph T. Ryerson & Sons*, 96 Mich.App. 480, 292 N.W.2d 704, 708–709 (1980) (Exploding multi-piece wheel case, *held*, (1) Jury question existed as to whether manufacturer of wheel side ring had duty to warn of "special" danger involved to tire repairman engaged in repair of flat tire, and (2) Manufacturers are duty bound to design products that are safe for their intended or reasonably anticipated use, which may include reasonably anticipated misuse.); *Henkel v. R and S Bottling Co.*, 323 N.W.2d 185 (Iowa 1982); *Niffenegger v. Lakeland Construction Co.*, 95 Ill.App.3d 420, 50 Ill.Dec. 945, 420 N.E.2d 262, 267 (1981); *Southwest Wheel & Manufacturing Co. v. Sholts*, 501 S.W.2d 387 (Tex.Civ.App.1973); *Knowles v. Jenney*, 157 Me. 392, 173 A.2d 347 (1961); 63 Am.Jur.2d *Products Liability* §§ 560 and 961 (1984) and cases cited therein.

Based on the foregoing, we hold that the trial court committed prejudicial and reversible error by giving Instruction # 19 without modification for foreseeable misuse, mismatch and change, and by failing to give the jury a separate instruction based on Budd's duty to warn under the theory of strict liability in tort.

## 4. IMPLIED WARRANTY AS SEPARATE, SUBSTANTIVE THEORY

The trial court originally denied defendant Budd's motion for summary judgment on the issues of implied warranty and strict liability. It instructed the jury with respect to defendant Budd on the theory of strict liability choosing, however, not to instruct on the issue of implied warranty.

Zacher claims this is error, that the theories are substantively different and that, by failure to instruct on each of such theories, the trial court prevented the jury from considering separate theories.

. In *Pearson v. Franklin Laboratories, Inc.*, 254 N.W.2d 133 (S.D.1977), we noted that once it was established that a product defect exists, there was little difference between the liability theories of breach of warranty and strict liability in tort, apart from the availability of the defenses of lack of notice, disclaimer, and perhaps lack of privity. Breach of warranty requires proof that a product did not conform to expectations; that the product was either nonmerchantable or unfit for an ordinary purpose. SDCL 57A–2–714(1), 57A–2–314(2)(c). Strict liability, on the other hand, requires that the product be defective and *unreasonably dangerous*. Restatement (Second) of Torts § 402A. As between strict liability under § 402A and warranty liability, the warranty predicate, "fitness for ordinary purposes," appears to set a lower liability threshhold that is more beneficial to a plaintiff. It also appears easier for the jury to understand and apply. However, several courts have held that for the purpose of jury instructions, strict liability claims subsume the warranty claim and have upheld trial courts' refusals to give parallel instructions.

In *Foster v. Ford Motor Co.*, 621 F.2d 715 (5th Cir.1980), the Fifth Circuit Court of Appeals responded to plaintiffs claims that they were entitled to an instruction on breach of warranty as follows: "We note the elements of proof for that theory and strict liability are substantially similar." *Id.* at 719. The court noted that the negative implication of the warranty requirements—that goods be "fit for the ordinary purposes for which such goods are used"— is that "the goods not be unreasonably dangerous." *Id.* In noting that the jury should be instructed on a legal theory only if the evidence is sufficient to justify such an instruction, the decision pointed out that the proof was directed primarily to the issue of whether the product itself was

"unreasonably dangerous." *Id.* at 718–719. As in *Foster,* most of Zacher's evidence went to show that multi-piece wheel assemblies are unreasonably dangerous or defectively designed.

◼ In *McKnelly v. Sperry Corp.,* 642 F.2d 1101 (8th Cir.1981), the court held that under the Iowa Products Liability Law the breach of warranty theory did not have to be submitted to the jury when strict liability and negligence are fully submitted. The Eighth Circuit Court noted:

> The Iowa Supreme Court takes the view that strict liability is ordinarily in lieu of a theory of implied warranty, and both theories should be submitted only in 'exceptional situations.' This is because as a practical matter, the issues under implied warranty are adequately submitted under strict liability, particularly in a personal injury as opposed to an economic injury action.

642 F.2d at 1105. In view of our previous holding in *Pearson, supra,* the Eighth Circuit decision would appear to be applicable in South Dakota as well. Therefore, although separate implied warranty instructions are favored and may be required in certain cases, it was not reversible error for the court to refuse these instructions in this case.

◼ In addition, Zacher was not entitled to instructions on implied warranty or strict liability as against defendants Yellowstone and Dixon. Yellowstone was the owner and lessor of the property in the instant case and its drivers continued to operate the equipment under the lease with Dixon. Dixon was the lessee of the equipment. Both were *users* of the equipment. Neither Yellowstone nor Dixon were sellers, lessors, or manufacturers of the equipment as to Zacher, who was not a user of the equipment but a bailee for repair, (i.e., a bailee to fix the flat tire for hire). Therefore, neither Yellowstone nor Dixon subjected themselves to liability under theories of either strict liability or implied warranty.

We have reviewed all of the other issues raised by the Zachers and find no error.

However, in view of our decision, the taxation of costs against them is vacated.

Accordingly, this case is reversed and remanded for a new trial in accordance with this opinion.

WUEST, C.J., and FOSHEIM, J., concur.

HENDERSON, J., concurs with a writing.

MORGAN, J., concurs in part and dissents in part.

HENDERSON, Justice (concurring).

In *Daugaard v. Baltic Co-op. Bldg. Supply Ass'n,* 349 N.W.2d 419 (S.D.1984), we determined that two statutes of repose, namely SDCL 15–2–9 and SDCL 15–2–12.1, violated the open courts provision of South Dakota Constitution Article VI, § 20. *Daugaard* thereafter was cited in *Salem Sch. Dist. 43–3 v. Puetz Constr., Inc.,* 353 N.W.2d 51, 53 (S.D.1984), as authority for vacating a summary judgment. In *Wright v. Int'l Harvester Co.,* 736 F.2d 483 (8th Cir.1984), the Eighth Circuit Court of Appeals also acted on our ruling in *Daugaard* and remanded that case for further proceedings in light of *Daugaard.*

*Daugaard* overruled *McMacken v. State,* 320 N.W.2d 131 (S.D.1982) (Justices Dunn and Henderson dissenting), and *Mitchell Sch. Dist. No. 17–2 v. Welfl Constr.,* 329 N.W.2d 138 (S.D.1983) (Justices Dunn and Henderson dissenting).

Obviously, I spiritually agree with the writing of this Court. In my dissent in *McMacken,* I decried the preclusion of access to the courts setting forth numerous decisions in this nation. *McMacken* at 140. Furthermore, I pointed out in said dissent that Article VI, § 20 of the South Dakota Constitution manifests the intention of our forefathers that our courts shall remain open for an injury done to a man's or woman's property, person, or reputation. Girded with the various authorities set forth in said dissent, *Daugaard* was born. Now, its verbiage and holding quoted and cited in the highest courts of Arizona and Utah strengthens my beliefs in the sound-

ness of the underlying rationale of *Daugaard.*

MORGAN, Justice (concurring in part, dissenting in part).

I would affirm the judgment and therefore I dissent in part and concur in part.

As to the first issue, the unconstitutionality of SDCL 15–2–12.1 in light of art. VI, § 20 of the South Dakota Constitution, the majority's reference to "this court's reputation for constancy, consistency and reasoned elaboration" has a hollow ring when the decisions on this issue are studied. Furthermore, to suggest that such reputation is strengthened by the legislature's reaction to *Daugaard v. Baltic Co-op. Bldg. Supply Ass'n,* 349 N.W.2d 419 (S.D. 1984) by enactment of SDCL 15–2–12.2, is mindful of the cook, who, having split the cake layer in removing it from the pan, solves the problem by covering the flaw with icing.

To examine this issue, we must first recognize that statutes of the nature of SDCL 15–2–12.1, denominated as "supplier's statutes" and statutes of the nature of SDCL 15–2–9, denominated as "builder's statutes," are commonly considered together for the purpose of constitutional analysis under "open court" provisions of state constitutions, such as art. VI, § 20 of the South Dakota Constitution. As the majority correctly notes, these statutes are not, strictly speaking, statutes of limitation, but rather operate as statutes of repose in cases such as this. This distinction was discussed in our decision in *McMacken v. State,* 320 N.W.2d 131, 139 (S.D.1982), *aff'd on rehearing,* 325 N.W.2d 60.

The record on constancy and consistency reflects that the first time this genus of statute was considered in the light of art. VI, § 20 was in *McMacken, supra.* The majority opinion and the dissents in that case reflect the divergency of views on the issue across the nation. The views reflected in the *McMacken* decision were the views of the five justices then on this bench. The *McMacken* decision was then followed in the decision of *Mitchell Sch.*

*Dist. No. 17–2 v. Welfl Const.,* 329 N.W.2d 138 (S.D.1983). The same five justices sat on that case and the same three-two decision resulted. The *McMacken* decision was also followed by the federal courts in *Ven Den Hul v. Baltic Farmers Elevator Co.,* 716 F.2d 504 (8th Cir.1983).

The departure from the *McMacken* authority came about in *Daugaard, supra,* when the two dissenters in *McMacken* were joined by two circuit court judges in declaring the statutes in violation of art. VI, § 20 on the same theory as had been expressed in the dissents in *McMacken. Daugaard* was then followed in *Salem School Dist. 43–3 v. Puetz Const., Inc.,* 353 N.W.2d 51 (S.D.1984).

It was between the *McMacken* and *Daugaard* cases that this case came on for trial. As the majority correctly notes, the trial court correctly followed the *McMacken* decision in giving the instructions to the jury. This is just such a situation that calls out for the constancy and consistency that the majority espouses. It was *Daugaard* that created the inconstancy and inconsistency and I suggest that the correct response is to be constant and consistent with the rule that can best stand critical scrutiny. That would be appropriate to the majority's call for "reasoned elaboration."

"Reasoned elaboration" is redundant because by definition "elaboration" is the art or process of elaborating, which in turn is defined as expansion, development or perfection especially by analysis or reasoning. Let us then compare the controverting decisions for their respective analytical or reasoning processes.

We must first begin this reasoning process by recognizing the long-standing rules of constitutional law that one who seeks to have a statute declared unconstitutional bears the burden of proving beyond a reasonable doubt that the statute violates a state constitutional provision. There is a strong presumption that laws enacted by the legislature are constitutional and that presumption is rebutted only when it clearly, palpably and plainly appears that the

statute violates a provision of the South Dakota Constitution. *Matter of Certain Territorial Elec. Boundaries, Etc.*, 281 N.W.2d 72 (S.D.1979). These basic tenets of constitutional construction were wholly absent from the *Daugaard* decision, nor do we find them mentioned in the majority opinion.

The analysis and reasoning of the *Daugaard* decision was stated in the quotation noted by the majority:

> Our constitution, as enacted by our forefathers and occasionally amended, is solid core upon which all our state laws must be premised. Clearly and unequivocably, our constitution directs that the courts of this state shall be open to the injured and oppressed.... SDCL 15–2–9 and SDCL 15–2–12.1 are a locked deadbolt and shackle on our courtroom doors.... SDCL 15–2–9 and SDCL 15–2–12.1 are statutes of nullification which stamp out our citizens' causes of action before they accrue. SDCL 15–2–9 and SDCL 15–2–12.1 have transgressed constitutional limitations and therefore it is our duty to declare these two statutes unconstitutional.

In this regard, the *Daugaard* decision followed closely the dissents of Justices Dunn and Henderson in *McMacken;* Henderson, J., being the author of *Daugaard.*

The strident, jingoistic language of the dissenters in *McMacken* was rejected by the *McMacken* majority. The *McMacken* opinion examined several of the decisions supporting unconstitutionality including *Lamb v. Powder River Live Stock Co.*, 132 F. 434 (8th Cir.1904), *Overland Const. Co., Inc. v. Sirmons*, 369 So.2d 572 (Fla.1979), and *Saylor v. Hall*, 497 S.W.2d 218 (Ky. 1973). The majority, however, found a Pennsylvania case, *Freezer Storage, Inc. v. Armstrong Cork Co.*, 476 Pa. 270, 382 A.2d 715 (1978), to be better reasoned.

> "[N]o one 'has a vested right in the continued existence of an immutable body of negligence law.... [T]he practical result of a [contrary] conclusion would be the stagnation of the law in the face of changing societal conditions.' ...

....

> This Court would encroach upon the Legislature's ability to guide the development of the law if we invalidated legislation simply because the rule enacted by the Legislature rejects some cause of action currently preferred by the courts. To do so would be to place certain rules of the 'common law' and certain nonconstitutional decisions of courts above all change except by constitutional amendment. Such a result would offend our notion of the checks and balances between the various branches of government, and of the flexibility required for the healthy growth of the law."

*McMacken*, 320 N.W.2d at 137 (quoting *Freezer Storage*, 476 Pa. at 279–81, 382 A.2d at 720–21) (brackets in original).

This reasoning is particularly pertinent in the case we have before us. In 1951, the time of manufacture of the wheel in question, Zacher's cause of action in strict liability was not known. Not until 1973 did South Dakota adopt strict liability as a viable cause of action in product liability cases. *Engberg v. Ford Motor Co.*, 87 S.D. 196, 205 N.W.2d 104 (1973) (adopting Restatement (Second) of Torts, § 402A as a rule of strict liability). Part of the justification for applying strict liability to the sellers of products is that public policy dictates that the burden of injuries caused by products be placed upon those who market the product and be treated as a cost of production against which liability insurance can be obtained. Restatement (Second) of Torts § 402 comment c (1977). As one author has noted, this basic premise of strict liability may not be applicable in a case involving an "old" product. Note, *Daugaard v. Baltic Cooperative Building Supply Association: Statutes of Limitation Held Unconstitutional*, 30 S.D.L.Rev. 157 (1984).

A basic predicate for strict liability—the ability of a manufacturer to distribute the cost of injuries in the price of his product—may not apply in cases of this kind. When the machine was sold, the manufacturer could not "cost in" tort

liability on the basis of a standard that would evolve 20 years in the future. *Id.* at 166 (quoting U.S. Dep't. of Commerce, Interagency Task Force on Product Liability Final Report, VII–22 (1977)).

This case presents the type of scenario envisioned by the commentators when looking at the purposes behind strict liability vis-a-vis statutes of repose. Why should Budd Company be held strictly liable for a multi-piece wheel manufactured in 1951 when (1) multi-piece wheels were the only type of wheel being manufactured at that date; and (2) a cause of action in strict liability was not recognized by South Dakota courts until some twenty-two years after manufacture of the wheel?

The *McMacken* decision also relied on South Dakota case authority. In *Behrns v. Burke*, 89 S.D. 96, 229 N.W.2d 86 (1975), in examining art. VI, § 20 of the South Dakota Constitution, this court said that the provision

"is a guarantee that 'for such wrongs as are recognized by the law of the land the courts shall be open and afford a remedy.' " Simons v. Kidd, 1949, 73 S.D. 41, 38 N.W.2d 883. The guest statute declares that injuries suffered by a guest because of a host's negligence are not caused by " 'wrongs as recognized by the law of the land.' "

*Behrns*, 89 S.D. at 100, 229 N.W.2d at 88. "Where no right of action is given, however, or no remedy exists, under either the common law or some statute, those constitutional provisions create none." *Simons v. Kidd*, 73 S.D. 41, 47, 38 N.W.2d 883, 886 (1949). Conversely, where a cause of action is implied or exists at common law without statutory abrogation, a plaintiff has a right to litigate and the courts will fashion a remedy. *Hoekstra v. Helgeland*, 78 S.D. 82, 98 N.W.2d 669 (1959); *Swanson v. Ball*, 67 S.D. 161, 290 N.W. 482 (1940); *Moberg v. Scott*, 38 S.D. 422, 161 N.W. 998 (1917). In the very recent case of *Oien v. City of Sioux Falls*, 393 N.W.2d 286 (S.D.

1986), we set forth the proper application of art. VI, § 20, the "open courts" provision. In *Oien*, we refused to allow the legislature to extend sovereign immunity to destroy a cause of action that existed at common law. There is no common law claim in the case at hand, since strict liability was not recognized in South Dakota until 1973.

Does this new line of decisions also overrule our decision in *Alberts v. Giebink*, 299 N.W.2d 454 (S.D.1980), wherein we refused to adopt a discovery rule and held that a cause of action for medical malpractice must arise within two years of occurrence? Henderson, J., the author of *Daugaard*, concurred in the *Alberts* decision. Moreover, does this line of cases overrule our decision in *Hunt v. Hunt*, 309 N.W.2d 818 (S.D.1981), wherein this court purported to abolish the common law tort of criminal conversation? *See Daugaard*, 349 N.W.2d at 427 (Wollman, J., dissenting).

And, under the analysis and reasoning of this line of cases, what does the future hold for the statute of repose relating to animal trespass, SDCL 48–18–10; the statute of repose dealing with contracts for sale under the UCC, SDCL 57A–2–725; the statute of repose concerning medical malpractice actions, SDCL 15–2–14.1, or legal malpractice actions, SDCL 15–2–14.2? It appears that any abrogation or diminution of a potential cause of action would violate art. VI, § 20 under the broad stroke of *Daugaard*.

The majority cites us to two cases that have followed *Daugaard: Kenyon v. Hammer*, 142 Ariz. 69, 688 P.2d 961 (1984) and *Berry v. Beech Aircraft*, 717 P.2d 670 (Utah 1985). With respect to the Arizona case, a medical malpractice action, the Arizona court adopted the *Daugaard* theme as supportive of the Arizona open courts provision which the decision then pointed out to be stronger than the South Dakota provision.* If our provision were as strong as

---

* In *Kenyon*, 142 Ariz. at 74, 688 P.2d at 966 (1984), the court noted:

"Instead of an open court provision, Arizona has a more specific and stronger requirement. Art. 18, § 6, provides as follows:

Arizona's, I might well agree that the *Daugaard* theme is appropriate; however, that is not the case. That is also the danger of comparing cases based solely on results, without regard to the similarity of statutory and constitutional provisions.

The Utah case, on the other hand, does involve an identical open courts provision. I concede that it numbers Utah among the states which hold statutes of repose unconstitutional. It is of more than passing interest that the opinion also goes on to discuss the affect the decision will have on previous decisions including a medical malpractice action. I further give the Utah court credit for having examined the issues with respect to both sides of the equation.

Finally, I do take issue with the majority's suggestion that the legislative reaction to *Daugaard* by amending SDCL 15-2-12.1 to provide a three-year statute of limitations amounts to approval of the *Daugaard* theme. It is noteworthy that the same legislature also enacted SDCL ch. 15-2A, dealing with limitation of actions for construction deficiencies. SDCL 15-2A-1 sets out at great length the legislative reasoning for the necessity of a statute of repose. While it appears that the statute is nevertheless doomed to extinction under the *Daugaard* line of cases, it does clearly demonstrate that the legislature did not intend to "impliedly affirm the decision in *Daugaard* by adopting the *Daugaard* rationale."

With regard to the second issue, I agree with the majority that the trial court erred in giving instruction No. 20 rather than Zacher's proposed instruction. I would hold, however, that Zacher was not prejudiced inasmuch as, at the time of manufacture, all truck wheels manufactured in this country were multi-piece wheels. I would, therefore, not reverse on that issue.

Finally, with respect to the third issue on failure to instruct, I would not reach those issues under my argument on the constitutionality of SDCL 15-2-12.1. I concur in the balance of the issues discussed except

The right of action to recover damages for injuries shall never be abrogated, and the

that I would affirm the taxation of the costs as allowed by the trial court.

amount recovered shall not be subject to any statutory limitation."